# NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE ET AL. v. CLAIBORNE HARDWARE CO. ET AL.

No. 81–202.   Argued March 3, 1982—Decided July 2, 1982

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. REHNQUIST, J., concurred in the result. MARSHALL, J., took no part in the consideration or decision of the case.

*Lloyd N. Cutler* argued the cause for petitioners. With him on the briefs were *James Robertson, Edward Tynes Hand, William R. Richardson, Jr., John Payton, Thomas I. Atkins, Charles E. Carter, William L. Robinson,* and *Frank R. Parker.*

*Grover Rees III* argued the cause for respondents. With him on the briefs were *Crane D. Kipp, Christopher J. Walker,* and *Dixon L. Pyles.**

JUSTICE STEVENS delivered the opinion of the Court.

The term "concerted action" encompasses unlawful conspiracies and constitutionally protected assemblies. The "looseness and pliability" of legal doctrine applicable to concerted action led Justice Jackson to note that certain joint activities have a "chameleon-like" character.[1] The boycott of white merchants in Claiborne County, Miss., that gave rise to this litigation had such a character; it included elements of criminality and elements of majesty. Evidence that fear of reprisals caused some black citizens to withhold their patronage from respondents' businesses convinced the Supreme Court of Mississippi that the entire boycott was unlawful and that each of the 92 petitioners was liable for all of its economic consequences. Evidence that persuasive rhetoric, determination to remedy past injustices, and a host of voluntary decisions by free citizens were the critical

---

*Briefs of *amici curiae* urging reversal were filed by *John Vanderstar, Charles S. Sims,* and *Phyllis N. Segal* for the American Civil Liberties Union et al.; by *J. Albert Woll, Laurence Gold,* and *George Kaufmann* for the American Federation of Labor and Congress of Industrial Organizations; and by *Paul S. Berger, David Bonderman, Leonard B. Simon,* and *Nathan Z. Dershowitz* for the American Jewish Congress.

[1] See *Krulewitch* v. *United States,* 336 U. S. 440, 447–449 (concurring opinion).

factors in the boycott's success presents us with the question whether the state court's judgment is consistent with the Constitution of the United States.

# I

In March 1966, black citizens of Port Gibson, Miss., and other areas of Claiborne County presented white elected officials with a list of particularized demands for racial equality and integration.[2] The complainants did not receive a satisfactory response and, at a local National Association for the Advancement of Colored People (NAACP) meeting at the First Baptist Church, several hundred black persons voted to place a boycott on white merchants in the area. On October 31, 1969, several of the merchants filed suit in state court to recover losses caused by the boycott and to enjoin future boycott activity. We recount first the course of that litigation and then consider in more detail the events that gave rise to the merchants' claim for damages.

# A

The complaint was filed in the Chancery Court of Hinds County by 17 white merchants.[3] The merchants named two corporations and 146 individuals as defendants: the NAACP, a New York membership corporation; Mississippi Action for Progress (MAP), a Mississippi corporation that im-

---

[2] Port Gibson is the county seat and largest municipality in Claiborne County.

[3] The affected businesses represented by the merchants included four grocery stores, two hardware stores, a pharmacy, two general variety stores, a laundry, a liquor store, two car dealers, two auto parts stores, and a gas station. Many of the owners of these boycotted stores were civic leaders in Port Gibson and Claiborne County. Respondents Allen and Al Batten were Aldermen in Port Gibson, Record 15111; Robert Vaughan, part owner and operator of one of the boycotted stores, represented Claiborne County in the Mississippi House of Representatives, *id.,* at 15160; respondents Abraham and Hay had served on the school board, *id.,* at 14906, 14678; respondent Hudson served on the Claiborne County Democratic Committee, *id.,* at 840.

plemented the federal "Head Start" program; Aaron Henry, the President of the Mississippi State Conference of the NAACP; Charles Evers, the Field Secretary of the NAACP in Mississippi; and 144 other individuals who had participated in the boycott.[4]   The complaint sought injunctive relief and an attachment of property, as well as damages.   Although it alleged that the plaintiffs were suffering irreparable injury from an ongoing conspiracy, no preliminary relief was sought.

Trial began before a chancellor in equity on June 11, 1973.[5] The court heard the testimony of 144 witnesses during an 8-month trial.   In August 1976, the chancellor issued an opinion and decree finding that "an overwhelming preponderance of the evidence" established the joint and several liability of

---

[4] The complaint also named 52 banks as "attachment defendants."   The banks answered that the NAACP had $16,800 on deposit in Mississippi.

[5] As a result of the plaintiffs' prayer for an attachment in equity, jurisdiction existed in Chancery Court.   The trial judge ruled: "It was incumbent upon this court to hear the case in full once jurisdiction was assumed.   To have heard the portions of this matter sounding in equity, only, and to have transferred the questions of tort liability and damages to the circuit court would have been contrary to the maxim 'equity delights to do complete justice, and not by halves.'"   App. to Pet. for Cert. 56b.   The defendants thus were denied a jury trial on the liability issues.   Although the court recognized that it had power to empanel a jury, it declined to exercise its discretion to do so.   *Ibid.*   The Mississippi nonresident attachment statute that provided the basis for equitable jurisdiction has since been declared unconstitutional by both Federal District Courts in Mississippi. *MPI, Inc.* v. *McCullough,* 463 F. Supp. 887 (ND Miss. 1978); *Mississippi Chem. Corp.* v. *Chemical Constr. Corp.,* 444 F. Supp. 925 (SD Miss. 1977).

Commencement of trial was delayed by collateral proceedings in federal court.   See *Henry* v. *First National Bank of Clarksdale,* 50 F. R. D. 251 (ND Miss. 1970), rev'd, 444 F. 2d 1300 (CA5 1971), cert. denied, 405 U. S. 1019.   The District Court entered a preliminary injunction restraining the state proceedings on the theory that the merchants sought to infringe the defendants' First Amendment rights.   The Court of Appeals reversed, holding that the mere commencement of a private tort suit did not itself involve "state action" for purposes of 28 U. S. C. § 1343(3).

130 of the defendants on three separate conspiracy theories.[6] First, the court held that the defendants were liable for the tort of malicious interference with the plaintiffs' businesses, which did not necessarily require the presence of a conspiracy.[7] Second, the chancellor found a violation of a state

---

[6] App. to Pet. for Cert. 2g. Of the original 148 named defendants, 16 were dismissed by stipulation of counsel (12 had died, 2 were minors, 1 was *non compos mentis,* and 1—the Reverend Dominic Cangemi—was dismissed by agreement without explanation). One defendant was dismissed because he had been misidentified in the complaint. The chancellor dismissed one defendant—state NAACP leader Aaron Henry—because "the complainants failed to meet the burden of proof as to [his] wrongdoing." *Id.,* at 28b. Thus, except for the defendants dismissed by stipulation or because of misidentification, the plaintiffs prevailed on the merits in the trial court against all but one of the defendants.

[7] Although the bulk of the court's discussion of the defendants' common-law tort liability focused on the presence of a civil conspiracy, the chancellor did not appear to hold that a concerted refusal to deal—without more— was actionable under the common law of Mississippi. The court apparently based its first theory of liability on the ground that the "malicious interference by the defendants with the businesses of the complainants as shown by the evidence in this case is tortious *per se,* and this would be true even without the element of conspiracy." *Id.,* at 42b (footnote omitted). In Mississippi, "[e]ither an individual or a corporation, whether acting in conjunction with others, or not," may be liable in an action for "malicious interference with a trade or calling." *Memphis Laundry-Cleaners* v. *Lindsey,* 192 Miss. 224, 239, 5 So. 2d 227, 232 (1941). The chancellor in this case stated that the necessary element of malice is established by proof of "the intentional performance of an act harmful to another without just or lawful cause or excuse." App. to Pet. for Cert. 42b, n. 8.

The repeated references to the presence of a conspiracy might be explained by the court's finding that each of the defendants—with the exception of Aaron Henry—was jointly and severally liable for the plaintiffs' losses. As noted, an element of the plaintiffs' common-law action was the defendants' intentional performance of an "unprivileged" act harmful to another. The chancellor stated that the evidence clearly established that "certain defendants" had committed "overt acts which were injurious to the trade and business of complainants." *Id.,* at 39b. The court continued: "Where two or more persons conspire together, the conspiracy makes the wrongful act of each person the joint acts of them all," *id.,* at 41b; "[i]t

statutory prohibition against secondary boycotts, on the theory that the defendants' primary dispute was with the governing authorities of Port Gibson and Claiborne County and not with the white merchants at whom the boycott was directed.[8] Third, the court found a violation of Mississippi's antitrust statute, on the ground that the boycott had diverted black patronage from the white merchants to black merchants and to other merchants located out of Claiborne County and thus had unreasonably limited competition between black and white merchants that had traditionally existed.[9] The chancellor specifically rejected the defendants' claim that their conduct was protected by the First Amendment.[10]

---

follows that each act done in pursuance of the conspiracy by one of several conspirators is, in contemplation of the law, an act for which each is jointly and severally liable." *Ibid.* Thus, the presence of a conspiracy rendered all of the "conspirators" liable for the wrongful acts of any member of that conspiracy.

[8] See Miss. Code Ann. § 97–23–85 (1972). The chancellor found: "The testimony in the case at bar clearly shows that the principal objective of the boycott was to force the white merchants of Port Gibson and Claiborne County to bring pressure upon governing authorities to grant defendants' demands or, in the alternative, to suffer economic ruin." App. to Pet. for Cert. 51b. As noted, however, many of the merchants themselves were civic leaders. See n. 3, *supra.*

[9] See Miss. Code Ann. § 75–21–9 (1972). The court made clear that under this theory intentional participation in the concerted action rendered each defendant directly liable for all resulting damages. "As a legal principle, it is sufficient to show that the concert of action on the part of the defendants was deliberately invited, and that the defendants gave their adherence to the scheme and participated in it." App. to Pet. for Cert. 54b. The same was true of the court's secondary boycott theory; "since an illegal boycott is an invasion of a property right, the members of the boycotting combination are liable for the resulting damages." *Id.,* at 53b.

[10] In its discussion of the secondary boycott statute, the court rejected an argument that the statute was unconstitutional under the First and Fourteenth Amendments. Noting as a "basic premise" that "secondary boycotts are unlawful under both United States and Mississippi law," the court stated that "conduct and communication which are illegal are not protected

Five of the merchants offered no evidence of business losses. The chancellor found that the remaining 12 had suffered lost business earnings and lost goodwill during a 7-year period from 1966 to 1972 amounting to $944,699. That amount, plus statutory antitrust penalties of $6,000 and a $300,000 award of attorney's fees, produced a final judgment of $1,250,699, plus interest from the date of judgment and costs. As noted, the chancellor found all but 18 of the original 148 defendants jointly and severally liable for the entire judgment. The court justified imposing full liability on the national organization of the NAACP on the ground that it had failed to "repudiate" the actions of Charles Evers, its Field Secretary in Mississippi.

In addition to imposing damages liability, the chancellor entered a broad permanent injunction. He permanently enjoined petitioners from stationing "store watchers" at the respondents' business premises; from "persuading" any person to withhold his patronage from respondents; from "using demeaning and obscene language to or about any person" because that person continued to patronize the respondents; from "picketing or patroling" the premises of any of the respondents; and from using violence against any person or inflicting damage to any real or personal property.[11]

---

by the constitutional provisions relating to freedom of speech." *Id.*, at 46b. In imposing liability under the state restraint of trade statute, the chancellor added: "After a careful consideration of the constitutional claims of defendants, the Court finds that none of the acts or conduct of defendants was shielded or protected by the Constitution of the United States or the Constitution of the State of Mississippi." *Id.*, at 55b–56b. Finally, in assessing damages, the court stated: "Defendants base their defense on the concept that the right to boycott and inflict losses on complainants was a legally protected right afforded them under the laws and Constitution of the United States. This Court has hereinbefore found that the conduct of the defendants was unlawful and unprotected." *Id.*, at 62b.

[11] *Id.*, at 19g. Following the entry of judgment, the defendants moved for relief from Mississippi's 125-percent supersedeas bonding requirement. Although the Mississippi Supreme Court denied the motion, a federal court

In December 1980, the Mississippi Supreme Court reversed significant portions of the trial court's judgment. 393 So. 2d 1290. It held that the secondary boycott statute was inapplicable because it had not been enacted until "the boycott had been in operation for upward of two years."[12] The court declined to rely on the restraint of trade statute, noting that the "United States Supreme Court has seen fit to hold boycotts to achieve political ends are not a violation of the Sherman Act, 15 U. S. C. § 1 (1970), after which our statute is patterned."[13] Thus, the court rejected two theories of liability that were consistent with a totally voluntary and non-violent withholding of patronage from the white merchants.

The Mississippi Supreme Court upheld the imposition of liability, however, on the basis of the chancellor's common-law tort theory. After reviewing the chancellor's recitation of the facts, the court quoted the following finding made by the trial court:

> "In carrying out the agreement and design, certain of the defendants, acting for all others, engaged in acts of physical force and violence against the persons and property of certain customers and prospective customers. Intimidation, threats, social ostracism, vilification, and traduction were some of the devices used by the defendants to achieve the desired results. Most effective, also, was the stationing of guards ('enforcers,' 'deacons,' or 'black hats') in the vicinity of white-owned businesses. Unquestionably, the evidence shows that the volition of many black persons was overcome out of sheer fear, and they were forced and compelled against their personal wills to withhold their trade and business intercourse

enjoined execution of the Chancery Court judgment pending appeal. *Henry* v. *First National Bank of Clarksdale*, 424 F. Supp. 633 (ND Miss. 1976), aff'd, 595 F. 2d 291 (CA5 1979), cert. denied, 444 U. S. 1074.

[12] 393 So. 2d, at 1300.

[13] *Id.*, at 1301.

from the complainants." App. to Pet. for Cert. 39b (quoted 393 So. 2d, at 1300).

On the basis of this finding, the court concluded that the entire boycott was unlawful. "If any of these factors—force, violence, or threats—is present, then the boycott is illegal regardless of whether it is primary, secondary, economical, political, social or other."[14] In a brief passage, the court rejected petitioners' reliance on the First Amendment:

"The agreed use of illegal force, violence, and threats against the peace to achieve a goal makes the present state of facts a conspiracy. We know of no instance, and our attention has been drawn to no decision, wherein it has been adjudicated that free speech guaranteed by the First Amendment includes in its protection the right to commit crime." *Id.*, at 1301.

The theory of the Mississippi Supreme Court, then, was that petitioners had *agreed* to use force, violence, and "threats" to effectuate the boycott.[15] To the trial court, such a finding had not been necessary.[16]

Although the Mississippi Supreme Court affirmed the chancellor's basic finding of liability, the court held that re-

---

[14] *Ibid.*

[15] The court did not specifically identify the evidence linking any of the defendants to such an agreement.

[16] As noted, liability under the secondary boycott and restraint of trade statutes could be found on the basis of an entirely voluntary and nonviolent agreement to withhold patronage. See n. 9, *supra.* It is not clear whether—in its imposition of tort liability—the trial court rested on a theory similar to that ultimately advanced by the Mississippi Supreme Court. In finding an unlawful civil conspiracy—which rendered each conspirator liable for the actions of others, see n. 7, *supra*—the chancellor arguably believed that it was necessary to connect all defendants to an agreement to use force or violence to effectuate the conspiracy. See App. to Pet. for Cert. 40b–41b. The chancellor made no factual finding, however, that such an agreement existed.

spondents "did not establish their case" with respect to 38 of the defendants.[17] The court found that MAP was a victim, rather than a willing participant, in the conspiracy and dismissed—without further explanation—37 individual defendants for lack of proof. Finally, the court ruled that certain damages had been improperly awarded and that other damages had been inadequately proved. The court remanded for further proceedings on the computation of damages.[18]

We granted a petition for certiorari. 454 U. S. 1030. At oral argument, a question arose concerning the factual basis for the judgment of the Mississippi Supreme Court. As noted, that court affirmed petitioners' liability for damages on the ground that each of the petitioners had agreed to effectuate the boycott through force, violence, and threats. Such a finding was not necessary to the trial court's imposition of liability and neither state court had identified the evidence actually linking the petitioners to such an agreement. In response to a request from this Court, respondents filed a supplemental brief "specifying the acts committed by each of the petitioners giving rise to liability for damages." Supplemental Brief for Respondents 1. That brief helpfully places the petitioners in different categories; we accept respondents' framework for analysis and identify these classes as a preface to our review of the relevant incidents that occurred during the 7-year period for which damages were assessed.[19]

---

[17] 393 So. 2d, at 1302.

[18] Concerning the permanent injunction entered by the chancellor, the court stated: "Although the granting of injunction has been assigned as error, the error has not been argued, and NAACP, et al. say, at the conclusion of their brief '. . . the injunctive aspects of the case are now moot. . . .'" *Id.*, at 1293. Despite this finding, the court did not vacate the injunction.

[19] Respondents acknowledge that "[t]he basis on which the Mississippi Supreme Court held that petitioners were liable for damages was 'the agreed use of illegal force, violence and threats.'" Supplemental Brief for Respondents 1–2.

First, respondents contend that liability is justified by evidence of participation in the "management" of the boycott.[20] Respondents identify two groups of persons who may be found liable as "managers": 79 individuals who regularly attended Tuesday night meetings of the NAACP at the First Baptist Church; and 11 persons who took "leadership roles" at those meetings.[21]

Second, respondents contend that liability is justified by evidence that an individual acted as a boycott "enforcer."[22] In this category, respondents identify 22 persons as members of the "Black Hats"—a special group organized during the boycott—and 19 individuals who were simply "store watchers."

Third, respondents argue that those petitioners "who themselves engaged in violent acts or who threatened violence have provided the best possible evidence that they wanted the boycott to succeed by coercion whenever it could not succeed by persuasion." *Id.*, at 10. They identify 16 in-

---

[20] Respondents argue that anyone "who participates in the decisionmaking functions of an enterprise, with full knowledge of the tactics by which the enterprise is being conducted, manifests his assent to those tactics . . . ." *Id.*, at 2. Respondents thus would impose liability for the managers' *failure* to act; respondents argue that, despite evidence that boycott "enforcers" caused fear of injury to persons and property, "they were not taken from their posts and replaced by a system of voluntary compliance; there is no evidence that any of the petitioners even admonished them for their enforcement methods; the successful system of paramilitary enforcers on the streets and 'rhetorical' threats of violence by boycott leaders was left in place for the duration." *Id.*, at 5.

[21] These groups are not meant to be exclusive.

[22] "Once the pattern had been established—warnings to prospective customers, destruction of goods purchased at boycotted stores, public displays of weapons and of military discipline, denunciation of names gathered by the store-watchers, and subsequent violence against the persons and property of boycott breakers—store-watching in Port Gibson became the sort of activity from which a court could reasonably infer an intention to frighten people away from the stores." *Id.*, at 8.

dividuals for whom there is direct evidence of participation in what respondents characterize as violent acts or threats of violence.

Fourth, respondents contend that Charles Evers may be held liable because he "threatened violence on a number of occasions against boycott breakers." *Id.*, at 13. Like the chancellor, respondents would impose liability on the national NAACP because Evers "was acting in his capacity as Field Secretary of the NAACP when he committed these tortious and constitutionally unprotected acts." *Ibid.*

Finally, respondents state that they are "unable to determine on what record evidence the state courts relied in finding liability on the part of seven of the petitioners." *Id.*, at 16. With these allegations of wrongdoing in mind, we turn to consider the factual events that gave rise to this controversy.

B

The chancellor held petitioners liable for all of respondents' lost earnings during a 7-year period from 1966 to December 31, 1972. We first review chronologically the principal events that occurred during that period, describe some features of the boycott that are not in dispute, and then identify the most significant evidence of violent activity.

In late 1965 or early 1966, Charles Evers, the Field Secretary of the NAACP, helped organize the Claiborne County Branch of the NAACP. The pastor of the First Baptist Church, James Dorsey, was elected president of the Branch; regular meetings were conducted each Tuesday evening at the church. At about the same time, a group of black citizens formed a Human Relations Committee and presented a petition for redress of grievances to civic and business leaders of the white community. In response, a biracial committee—including five of the petitioners and several of the respondents—was organized and held a series of unproductive meetings.

The black members of the committee then prepared a further petition entitled "Demands for Racial Justice." This pe-

tition was presented for approval at the local NAACP meeting conducted on the first Tuesday evening in March. As described by the chancellor, "the approximately 500 people present voted their approval unanimously."[23] On March 14, 1966, the petition was presented to public officials of Port Gibson and Claiborne County.

The petition included 19 specific demands. It called for the desegregation of all public schools and public facilities, the hiring of black policemen, public improvements in black residential areas, selection of blacks for jury duty, integration of bus stations so that blacks could use all facilities, and an end to verbal abuse by law enforcement officers. It stated that "Negroes are not to be addressed by terms as 'boy,' 'girl,' 'shine,' 'uncle,' or any other offensive term, but as 'Mr.,' 'Mrs.,' or 'Miss,' as is the case with other citizens."[24] As described by the chancellor, the purpose of the demands "was to gain equal rights and opportunities for Negro citizens."[25] The petition further provided that black leaders hoped it would not be necessary to resort to the "selective buying campaigns" that had been used in other communities.[26] On March 23, two demands that had been omitted

---

[23] App. to Pet. for Cert. 15b.

[24] Id., at 10b.

[25] Id., at 12b.

[26] The petition stated:

"We hope it will not be necessary to resort to the kind of peaceful demonstrations and selective buying campaigns which have had to be used in other communities. It takes manpower, time and energy which could be better directed at solving these problems which exist in Port Gibson and Claiborne County by mutual cooperation and efforts at tolerant understanding.

"No one likes to have to resort to picketing and other kinds of demonstration—just as no one likes to be the target of this kind of demonstration. But this sort of thing is inevitable unless there can be real progress toward giving all citizens their equal rights. There seems sometimes to be no other alternative.

"Objectives of Negro citizens of Port Gibson and Claiborne County are, simply put, to have equality of opportunity, in every aspect of life, and to end the white supremacy which has pervaded community life. This im-

from the original petition were added, one of which provided: "All stores must employ Negro clerks and cashiers."[27] This supplemental petition stated that a response was expected by April 1.

A favorable response was not received. On April 1, 1966, the Claiborne County NAACP conducted another meeting at the First Baptist Church. As described by the chancellor:

> "Several hundred black people attended the meeting, and the purpose was to decide what action should be taken relative to the twenty-one demands. Speeches were made by Evers and others, and a vote was taken. It was the unanimous vote of those present, without dissent, to place a boycott on the white merchants of Port Gibson and Claiborne County." App. to Pet. for Cert. 15b.

The boycott was underway.[28]

In September 1966, Mississippi Action for Progress, Inc. (MAP), was organized to develop community action programs in 20 counties of Mississippi. One of MAP's programs— known as Head Start—involved the use of federal funds to provide food for young children. Originally, food purchases in Claiborne County were made alternately from white-owned and black-owned stores, but in February 1967 the di-

---

plies many long-range objectives such as participation in decision-making at every level of community, civic, business and political affairs." *Id.*, at 9b.

[27] *Id.*, at 13b.

[28] Although Evers' speech on April 1, 1966, was not recorded, the chancellor found: "Evers told his audience that they would be watched and that blacks who traded with white merchants would be *answerable to him.* According to Sheriff Dan McKay, who was present during the speech, Evers told the assembled black people that any 'uncle toms' who broke the boycott would 'have their necks broken' by their own people. Evers' remarks were directed to all 8,000-plus black residents of Claiborne County, and not merely the relatively few members of the Claiborne NAACP." *Id.*, at 17b–18b (footnote omitted).

rectors of MAP authorized their Claiborne County represent-
atives to purchase food only from black-owned stores. Since
MAP bought substantial quantities of food, the consequences
of this decision were significant. A large portion of the trial
was devoted to the question whether MAP participated in
the boycott voluntarily and—under the chancellor's theories
of liability—could be held liable for the resulting damages.
The chancellor found MAP a willing participant, noting that
"during the course of the trial, the only Head Start cooks
called to the witness stand testified that they refused to go
into white-owned stores to purchase groceries for the chil-
dren in the program *for the reason that they were in favor of
the boycott and wanted to honor it.*" [29]

Several events occurred during the boycott that had a
strong effect on boycott activity. On February 1, 1967, Port
Gibson employed its first black policeman. During that
month, the boycott was lifted on a number of merchants. On
April 4, 1968, Dr. Martin Luther King, Jr., was assassinated
in Memphis. The chancellor found that this tragic event had
a depressing effect on the black community and, as a result,
the boycott "tightened." [30]

---

[29] *Id.*, at 22b (emphasis in original). The chancellor also noted that
MAP's Board of Directors "did not seek help from local law-enforcement
officers, nor did they complain to United States authorities for protection
of their cooks from possible reprisals arising from trade with the white
merchants"; and that "MAP employees in Claiborne County continued to
take an active part in the NAACP activities and to support the boycott by
picketing and marching." *Id.*, at 23b. The Mississippi Supreme Court
rejected the chancellor's findings and concluded that MAP was not a willing
participant in the boycott, thus absolving it from liability.

[30] *Id.*, at 25b. One of the respondents awarded the most in damages,
Barbara Ellis—a partner in Ellis Variety Store—testified that the store
was boycotted from April 1, 1966, until January 27, 1967. On the latter
date, the store agreed—apparently at the urging of a biracial committee—
to hire a black cashier. Record 1183. The boycott was reimposed on
April 17, 1968, after the death of Martin Luther King, Jr., but again was
lifted on May 1, 1968. *Id.*, at 1184. The boycott finally was reimposed on
April 19, 1969, the day following the shooting of Roosevelt Jackson. *Ibid.*

One event that occurred during the boycott is of particular significance. On April 18, 1969, a young black man named Roosevelt Jackson was shot and killed during an encounter with two Port Gibson police officers.[31] Large crowds immediately gathered, first at the hospital and later at the church. Tension in the community neared a breaking point. The local police requested reinforcements from the State Highway Patrol and sporadic acts of violence ensued. The Mayor and Board of Aldermen placed a dawn-to-dusk curfew into effect.

On April 19, Charles Evers spoke to a group assembled at the First Baptist Church and led a march to the courthouse where he demanded the discharge of the entire Port Gibson Police Force. When this demand was refused, the boycott was reimposed on all white merchants. One of Evers' speeches on this date was recorded by the police. In that speech—significant portions of which are reproduced in an Appendix to this opinion—Evers stated that boycott violators would be "disciplined" by their own people and warned that the Sheriff could not sleep with boycott violators at night.

On April 20, Aaron Henry came to Port Gibson, spoke to a large gathering, urged moderation, and joined local leaders in a protest march and a telegram sent to the Attorney General of the United States. On April 21, Evers gave another speech to several hundred people, in which he again called for a discharge of the police force and for a total boycott of all white-owned businesses in Claiborne County. Although this speech was not recorded, the chancellor found that Evers stated: "If we catch any of you going in any of them racist stores, we're gonna break your damn neck."[32]

As noted, this lawsuit was filed in October 1969. No significant events concerning the boycott occurred after that

---

[31] The officers had gone to Jackson's home to arrest him. A scuffle ensued and Jackson was shot by a white officer allegedly while being held by a black officer.

[32] App. to Pet. for Cert. 27b.

time. The chancellor identified no incident of violence that occurred after the suit was brought. He did identify, however, several significant incidents of boycott-related violence that occurred some years earlier.

Before describing that evidence, it is appropriate to note that certain practices generally used to encourage support for the boycott were uniformly peaceful and orderly. The few marches associated with the boycott were carefully controlled by black leaders. Pickets used to advertise the boycott were often small children. The police made no arrests—and no complaints are recorded—in connection with the picketing and occasional demonstrations supporting the boycott. Such activity was fairly irregular, occurred primarily on weekends, and apparently was largely discontinued around the time the lawsuit was filed.[33]

One form of "discipline" of black persons who violated the boycott appears to have been employed with some regularity. Individuals stood outside of boycotted stores and identified those who traded with the merchants. Some of these "store watchers" were members of a group known as the "Black Hats" or the "Deacons."[34] The names of persons who vio-

---

[33] Record 1146. The Sheriff of Claiborne County testified: "There were pickets off and on from April, 1966 to 1970." *Id.*, at 1060. When asked to describe "how they conducted themselves, what they did, what they went about doing," he stated: "Most of them carried or either had signs on their shoulders and they walked up and down the streets in front of the stores. They wouldn't always picket the same stores at the same time. At different times they might picket M&M then they would move up and picket Claiborne Hardware down Market Street to other businesses. Most of the time it was teenagers and at the last it was little bitty fellows, as young as about six years old. That was '69 and '70." *Ibid.* The Sheriff also testified that the boycott was "tight" in April 1966, April 1968, and April 1969. *Id.*, at 1152.

[34] Evidence concerning the aims and practices of the "Black Hats" is contradictory. Respondents describe them as a "paramilitary organization." Petitioner Elmo Scott, a member of the group, testified concerning instructions that were given to him: "It was given to the Deacons to give respect to the people that was on the street and, regardless of what they say back to you, for you not to use bad language to them or not to curse

lated the boycott were read at meetings of the Claiborne County NAACP and published in a mimeographed paper entitled the "Black Times." As stated by the chancellor, those persons "were branded as traitors to the black cause, called demeaning names, and socially ostracized for merely trading with whites."[35]

The chancellor also concluded that a quite different form of discipline had been used against certain violators of the boycott. He specifically identified 10 incidents that "strikingly" revealed the "atmosphere of fear that prevailed among blacks from 1966 until 1970."[36] The testimony concerning four incidents convincingly demonstrates that they occurred because the victims were ignoring the boycott. In two cases, shots were fired at a house; in a third, a brick was thrown through a windshield; in the fourth, a flower garden was damaged. None of these four victims, however, ceased trading with white merchants.[37]

---

them or no kind of way, just talk to them in the right manner of way." *Id.*, at 2985. It is undisputed that the "Black Hats" were formed during the boycott, that members of the organization engaged in "store watching" and other "enforcement" activities, and that some individuals who belonged to the group committed acts of violence.

[35] App. to Pet. for Cert. 19b.

[36] *Id.*, at 35b.

[37] On August 22, 1966, birdshot was fired into the home of James Gilmore, a black man who ignored the boycott. He immediately grabbed a shotgun, leapt into his car, pursued the vehicle from which he believed the shots had come, forced it to the side of the road, and apprehended three young black men who were active supporters of the boycott. They were indicted, tried, and convicted, but the convictions were set aside on appeal. *Whitney* v. *State*, 205 So. 2d 284 (Miss. 1967). Gilmore continued to patronize white merchants after the incident.

In June 1966, while Murriel Cullens was having a beer in Wolf's Store, a brick was thrown through the windshield of his parked car. He had been patronizing white merchants and continued to do so thereafter. Record 14049. In November 1966, shotgun pellets were fired into the wall of his mother's home. She had received a number of threatening telephone calls criticizing her for patronizing white stores. She continued to do so after the incident. *Id.*, at 14003. At trial, Laura Cullens testified, in response

The evidence concerning four other incidents is less clear, but again it indicates that an unlawful form of discipline was applied to certain boycott violators. In April 1966, a black couple named Cox asked for a police escort to go into a white-owned dry cleaner and, a week later, shots were fired into their home. In another incident, an NAACP member took a bottle of whiskey from a black man who had purchased it in a white-owned store. The third incident involved a fight between a commercial fisherman who did not observe the boycott and four men who "grabbed me and beat me up and took a gun off me."[38] In a fourth incident, described only in hearsay testimony, a group of young blacks apparently pulled down the overalls of an elderly brick mason known as "Preacher White" and spanked him for not observing the boycott.[39]

Two other incidents discussed by the chancellor are of less certain significance. Jasper Coleman testified that he par-

---

to a question whether she had been scared: "No indeed. I haven't had a bone in me scared in my life from nobody. And I have always told them, they say, 'You're just an uncle tom.' And I say, 'Well, uncle tom can be blue, black, green or purple or white. If I feel I am in the right, I stand in that right and nobody tells me what to do.'" *Id.*, at 14017.

James Bailey, who was a teenager at the time of the incident, testified that he had noticed that an elderly black lady named Willie Butler traded with a white merchant and had groceries delivered to her home. He testified that he destroyed flowers in her garden to punish her for violating the boycott. *Id.*, at 3656. He stated that he acted on his own initiative and that Mrs. Butler continued to trade with the merchant. *Id.*, at 3660, 3741.

[38] *Id.*, at 13868. One of his assailants testified that the incident resulted from an automobile accident, rather than the boycott. *Id.*, at 3656.

[39] "Preacher White" had died by the time of trial. No witness admitted being present at what respondents' counsel characterized as "the spanking of Preacher White." *Id.*, at 3696. The Port Gibson Chief of Police testified, however, that White had come in and complained that a group of young blacks had pulled his overalls down and whipped him. *Id.*, at 2176. In describing this incident, the chancellor stated that Preacher White "was stripped of his clothing and whipped by a group of young blacks because he refused to honor the boycott." App. to Pet. for Cert. 37b.

ticipated in an all-night poker game at a friend's house on Christmas Eve 1966. The following morning he discovered that all four tires of his pickup truck had been slashed with a knife. Coleman testified that he did not participate in the boycott but was never threatened for refusing to do so. Record 13791. Finally, Willie Myles testified that he and his wife received a threatening phone call and that a boy on a barge told him that he would be whipped for buying his gas at the wrong place.

Five of these incidents occurred in 1966. The other five are not dated. The chancellor thus did not find that any act of violence occurred after 1966.[40] In particular, he made no reference to any act of violence or threat of violence—with the exception, of course, of Charles Evers' speeches—after the shootings of Martin Luther King, Jr., in 1968 or Roosevelt Jackson in 1969. The chancellor did not find that any of the incidents of violence was discussed at the Tuesday evening meetings of the NAACP.[41]

## II

This Court's jurisdiction to review the judgment of the Mississippi Supreme Court is, of course, limited to the fed-

---

[40] In describing the "atmosphere of fear" existing during the boycott, the chancellor emphasized the participation of petitioner Rudy Shields. He stated:

"Defendant Rudolph J. (Rudy) Shields, formerly of Chicago, was the principal figure in several altercations. He boasted that he was 'the most jailed person in the Claiborne County boycott.' This man was the acknowledged leader of the 'Deacons.'" *Id.*, at 35b.

See also Supplemental Brief for Respondents 10–13. The record indicates that Shields was in Port Gibson for approximately eight months during 1966. Record 4993.

[41] The chancellor did find—and apparently believed this fact to be significant—that the NAACP provided attorneys to black persons arrested in connection with acts arising from the boycott. App. to Pet. for Cert. 38b. The NAACP provided legal representation to the three black persons arrested in August 1966 following the Gilmore shooting.

eral questions necessarily decided by that court.[42]   We consider first whether petitioners' activities are protected in any respect by the Federal Constitution and, if they are, what effect such protection has on a lawsuit of this nature.

## A

The boycott of white merchants at issue in this case took many forms.   The boycott was launched at a meeting of a local branch of the NAACP attended by several hundred persons.   Its acknowledged purpose was to secure compliance by both civic and business leaders with a lengthy list of demands for equality and racial justice.   The boycott was supported by speeches and nonviolent picketing.   Participants repeatedly encouraged others to join in its cause.

Each of these elements of the boycott is a form of speech or conduct that is ordinarily entitled to protection under the First and Fourteenth Amendments.[43]   The black citizens named as defendants in this action banded together and collectively expressed their dissatisfaction with a social structure that had denied them rights to equal treatment and respect.   As we so recently acknowledged in *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley,* 454 U. S. 290, 294, "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process."   We recognized that "by collective effort individuals can make their views known, when, individually, their voices would be faint

---

[42] Although the Mississippi Supreme Court remanded for a recomputation of damages, its judgment is final for purposes of our jurisdiction.   See *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 480.

[43] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."   U. S. Const., Amdt. 1.   First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the States.   *Edwards* v. *South Carolina,* 372 U. S. 229, 235.

or lost." *Ibid.* In emphasizing "the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues," *id.*, at 295, we noted the words of Justice Harlan, writing for the Court in *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460:

> "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly."

THE CHIEF JUSTICE stated for the Court in *Citizens Against Rent Control:* "There are, of course, some activities, legal if engaged in by one, yet illegal if performed in concert with others, but political expression is not one of them." 454 U. S., at 296.

The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected. In *De Jonge* v. *Oregon,* 299 U. S. 353, the Court unanimously held that an individual could not be penalized simply for assisting in the conduct of an otherwise lawful meeting held under the auspices of the Communist Party, an organization that advocated "criminal syndicalism." After reviewing the rights of citizens "to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances," *id.*, at 364, Chief Justice Hughes, writing for the Court, stated:

> "It follows from these considerations that, consistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime. The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as criminals on that score. The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices

under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects. If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge." *Id.*, at 365.

Of course, the petitioners in this case did more than assemble peaceably and discuss among themselves their grievances against governmental and business policy. Other elements of the boycott, however, also involved activities ordinarily safeguarded by the First Amendment. In *Thornhill* v. *Alabama*, 310 U. S. 88, the Court held that peaceful picketing was entitled to constitutional protection, even though, in that case, the purpose of the picketing "was concededly to advise customers and prospective customers of the relationship existing between the employer and its employees and thereby to induce such customers not to patronize the employer." *Id.*, at 99. Cf. *Chauffeurs* v. *Newell*, 356 U. S. 341. In *Edwards* v. *South Carolina*, 372 U. S. 229, we held that a peaceful march and demonstration was protected by the rights of free speech, free assembly, and freedom to petition for a redress of grievances.

Speech itself also was used to further the aims of the boycott. Nonparticipants repeatedly were urged to join the common cause, both through public address and through personal solicitation. These elements of the boycott involve speech in its most direct form. In addition, names of boycott violators were read aloud at meetings at the First Baptist Church and published in a local black newspaper. Petitioners admittedly sought to persuade others to join the boycott

through social pressure and the "threat" of social ostracism. Speech does not lose its protected character, however, simply because it may embarrass others or coerce them into action. As Justice Rutledge, in describing the protection afforded by the First Amendment, explained:

"It extends to more than abstract discussion, unrelated to action. The First Amendment is a charter for government, not for an institution of learning. 'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *Thomas* v. *Collins*, 323 U. S. 516, 537.

In *Organization for a Better Austin* v. *Keefe*, 402 U. S. 415, the Court considered the validity of a prior restraint on speech that invaded the "privacy" of the respondent. Petitioner, a racially integrated community organization, charged that respondent, a real estate broker, had engaged in tactics known as "blockbusting" or "panic peddling."[44] Petitioner asked respondent to sign an agreement that he would not solicit property in their community. When he refused, petitioner distributed leaflets near respondent's home that were critical of his business practices.[45] A state court enjoined petitioner from distributing the leaflets; an appellate court affirmed on the ground that the alleged activities were coercive and intimidating, rather than informative, and therefore not entitled to First Amendment protection. *Id.*, at 418. This Court reversed. THE CHIEF JUSTICE explained:

"This Court has often recognized that the activity of peaceful pamphleteering is a form of communication pro-

---

[44] Specifically, petitioner contended that respondent "aroused the fears of the local white residents that Negroes were coming into the area and then, exploiting the reactions and emotions so aroused, was able to secure listings and sell homes to Negroes." 402 U. S., at 416.

[45] One of petitioner's officers testified at trial that he had hoped that respondent would be induced to sign the no-solicitation agreement by letting "his neighbors know what he was doing to us." *Id.*, at 417.

tected by the First Amendment. *E. g.*, *Martin* v. *City of Struthers*, 319 U. S. 141 (1943); *Schneider* v. *State*, 308 U. S. 147 (1939); *Lovell* v. *Griffin*, 303 U. S. 444 (1938). In sustaining the injunction, however, the Appellate Court was apparently of the view that petitioners' purpose in distributing their literature was not to inform the public, but to 'force' respondent to sign a no-solicitation agreement. The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment. Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper. See *Schneider* v. *State, supra; Thornhill* v. *Alabama*, 310 U. S. 88 (1940). Petitioners were engaged openly and vigorously in making the public aware of respondent's real estate practices. Those practices were offensive to them, as the views and practices of petitioners are no doubt offensive to others. But so long as the means are peaceful, the communication need not meet standards of acceptability." *Id.*, at 419.

In dissolving the prior restraint, the Court recognized that "offensive" and "coercive" speech was nevertheless protected by the First Amendment.[46]

In sum, the boycott clearly involved constitutionally protected activity. The established elements of speech, assembly, association, and petition, "though not identical, are inseparable." *Thomas* v. *Collins, supra*, at 530. Through exercise of these First Amendment rights, petitioners sought to bring about political, social, and economic change.

---

[46] See *Watts* v. *United States*, 394 U. S. 705, 708 ("The language of the political arena, like the language used in labor disputes, see *Linn* v. *United Plant Guard Workers of America*, 383 U. S. 53, 58 (1966), is often vituperative, abusive, and inexact"). See also *Cohen* v. *California*, 403 U. S. 15; Farber, Commercial Speech and First Amendment Theory, 74 Nw. U. L. Rev. 372 (1979).

Through speech, assembly, and petition—rather than through riot or revolution—petitioners sought to change a social order that had consistently treated them as second-class citizens.

The presence of protected activity, however, does not end the relevant constitutional inquiry. Governmental regulation that has an incidental effect on First Amendment freedoms may be justified in certain narrowly defined instances. See *United States* v. *O'Brien*, 391 U. S. 367.[47]  A nonviolent and totally voluntary boycott may have a disruptive effect on local economic conditions. This Court has recognized the strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association. See *Giboney* v. *Empire Storage & Ice Co.*, 336 U. S. 490; *NLRB* v. *Retail Store Employees*, 447 U. S. 607. The right of business entities to "associate" to suppress competition may be curtailed. *National Society of Professional Engineers* v. *United States*, 435 U. S. 679. Unfair trade practices may be restricted. Secondary boycotts and picketing by labor unions may be prohibited, as part of "Congress' striking of the delicate balance between union freedom of expression and the ability of neutral employers, employees, and consumers to remain free from coerced participation in industrial strife." *NLRB* v. *Retail Store Employees*, *supra*, at 617–618 (BLACK-MUN, J., concurring in part). See *Longshoremen* v. *Allied International, Inc.*, 456 U. S. 212, 222–223, and n. 20.

---

[47] "To characterize the quality of the governmental interest which must appear, the Court has employed a variety of descriptive terms: compelling; substantial; subordinating; paramount; cogent; strong. Whatever imprecision inheres in these terms, we think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U. S., at 376–377 (footnotes omitted).

While States have broad power to regulate economic activity, we do not find a comparable right to prohibit peaceful political activity such as that found in the boycott in this case. This Court has recognized that expression on public issues "has always rested on the highest rung of the hierarchy of First Amendment values." *Carey* v. *Brown*, 447 U. S. 455, 467. "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison* v. *Louisiana*, 379 U. S. 64, 74–75. There is a "profound national commitment" to the principle that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270.

In *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127, the Court considered whether the Sherman Act prohibited a publicity campaign waged by railroads against the trucking industry that was designed to foster the adoption of laws destructive of the trucking business, to create an atmosphere of distaste for truckers among the general public, and to impair the relationships existing between truckers and their customers. Noting that the "right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms," the Court held that the Sherman Act did not proscribe the publicity campaign. *Id.*, at 137–138. The Court stated that it could not see how an intent to influence legislation to destroy the truckers as competitors "could transform conduct otherwise lawful into a violation of the Sherman Act." *Id.*, at 138–139. Noting that the right of the people to petition their representatives in government "cannot properly be made to depend on their intent in doing so," the Court held that "at least insofar as the railroads' campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." *Id.*, at 139–140. This conclusion was not changed by the fact that the railroads' anticompetitive *purpose* produced an anti-

competitive *effect;* the Court rejected the truckers' Sherman Act claim despite the fact that "the truckers sustained some direct injury as an incidental effect of the railroads' campaign to influence governmental action." *Id.,* at 143.

It is not disputed that a major purpose of the boycott in this case was to influence governmental action. Like the railroads in *Noerr,* the petitioners certainly foresaw—and directly intended—that the merchants would sustain economic injury as a result of their campaign. Unlike the railroads in that case, however, the purpose of petitioners' campaign was not to destroy legitimate competition. Petitioners sought to vindicate rights of equality and of freedom that lie at the heart of the Fourteenth Amendment itself. The right of the States to regulate economic activity could not justify a complete prohibition against a nonviolent, politically motivated boycott designed to force governmental and economic change and to effectuate rights guaranteed by the Constitution itself.[48]

In upholding an injunction against the state supersedeas bonding requirement in this case, Judge Ainsworth of the Court of Appeals for the Fifth Circuit cogently stated:

"At the heart of the Chancery Court's opinion lies the belief that the mere organization of the boycott and every activity undertaken in support thereof could be subject to judicial prohibition under state law. This

---

[48] In *NAACP* v. *Alabama ex rel. Flowers,* 377 U. S. 288, the Court unanimously rejected Alabama's effort to oust the NAACP from that State. The State claimed, in part, that the NAACP was "'engaged in organizing, supporting and financing an illegal boycott'" of Montgomery's bus system. *Id.,* at 302. Writing for the Court, Justice Harlan described as "doubtful" the "assumption that an organized refusal to ride on Montgomery's buses in protest against a policy of racial segregation might, without more, in some circumstances violate a valid state law." *Id.,* at 307. In *Missouri* v. *National Organization for Women, Inc.,* 620 F. 2d 1301, 1317 (CA8 1980), cert. denied, 449 U. S. 842, Judge Stephenson stated that "the right to petition is of such importance that it is not an improper interference [under state tort law] even when exercised by way of a boycott."

view accords insufficient weight to the First Amendment's protection of political speech and association. There is no suggestion that the NAACP, MAP or the individual defendants were in competition with the white businesses or that the boycott arose from parochial economic interests. On the contrary, the boycott grew out of a racial dispute with the white merchants and city government of Port Gibson and all of the picketing, speeches, and other communication associated with the boycott were directed to the elimination of racial discrimination in the town. This differentiates this case from a boycott organized for economic ends, for speech to protest racial discrimination is essential political speech lying at the core of the First Amendment." *Henry* v. *First National Bank of Clarksdale*, 595 F. 2d 291, 303 (1979) (footnote omitted).

We hold that the nonviolent elements of petitioners' activities are entitled to the protection of the First Amendment.[49]

## B

The Mississippi Supreme Court did not sustain the chancellor's imposition of liability on a theory that state law prohibited a nonviolent, politically motivated boycott. The fact that such activity is constitutionally protected, however, imposes a special obligation on this Court to examine critically the basis on which liability was imposed.[50] In particular, we

---

[49] We need not decide in this case the extent to which a narrowly tailored statute designed to prohibit certain forms of anticompetitive conduct or certain types of secondary pressure may restrict protected First Amendment activity. No such statute is involved in this case. Nor are we presented with a boycott designed to secure aims that are themselves prohibited by a valid state law. See *Hughes* v. *Superior Court*, 339 U. S. 460.

[50] "This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. This is such a case, particularly since the question is one of alleged trespass across 'the line between speech unconditionally guaranteed and speech which may

consider here the effect of our holding that much of petitioners' conduct was constitutionally protected on the ability of the State to impose liability for elements of the boycott that were not so protected.[51]

The First Amendment does not protect violence. "Certainly violence has no sanctuary in the First Amendment, and the use of weapons, gunpowder, and gasoline may not constitutionally masquerade under the guise of 'advocacy.'" *Samuels* v. *Mackell,* 401 U. S. 66, 75 (Douglas, J., concurring). Although the extent and significance of the violence in this case are vigorously disputed by the parties, there is no question that acts of violence occurred. No federal rule of law restricts a State from imposing tort liability for business losses that are caused by violence and by threats of violence. When such conduct occurs in the context of constitutionally protected activity, however, "precision of regulation" is demanded. *NAACP* v. *Button,* 371 U. S. 415, 438.[52] Specifically, the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to

---

legitimately be regulated.' *Speiser* v. *Randall,* 357 U. S. 513, 525. In cases where that line must be drawn, the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' *Pennekamp* v. *Florida,* 328 U. S. 331, 335; see also *One, Inc.* v. *Olesen,* 355 U. S. 371; *Sunshine Book Co.* v. *Summerfield,* 355 U. S. 372. We must 'make an independent examination of the whole record,' *Edwards* v. *South Carolina,* 372 U. S. 229, 235, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 285.

[51] Although this is a civil lawsuit between private parties, the application of state rules of law by the Mississippi state courts in a manner alleged to restrict First Amendment freedoms constitutes "state action" under the Fourteenth Amendment. *New York Times Co.* v. *Sullivan, supra,* at 265.

[52] See also *Carroll* v. *Princess Anne,* 393 U. S. 175, 184; *Keyishian* v. *Board of Regents,* 385 U. S. 589, 604.

damages liability and on the persons who may be held accountable for those damages.

In *Mine Workers* v. *Gibbs*, 383 U. S. 715, the Court considered a case in many respects similar to the one before us. The case grew out of the rivalry between the United Mine Workers (UMW) and the Southern Labor Union (SLU) over representation of workers in the southern Appalachian coal fields. A coal company laid off 100 miners of UMW's Local 5881 when it closed one of its mines. That same year, a subsidiary of the coal company hired Gibbs as mine superintendent to attempt to open a new mine on nearby property through use of members of the SLU. Gibbs also received a contract to haul the mine's coal to the nearest railroad loading point. When he attempted to open the mine, however, he was met by armed members of Local 5881 who threatened Gibbs and beat an SLU organizer. These incidents occurred on August 15 and 16. Thereafter, there was no further violence at the mine site and UMW members maintained a peaceful picket line for nine months. No attempts to open the mine were made during that period.

Gibbs lost his job as superintendent and never began performance of the haulage contract. Claiming to have suffered losses as a result of the union's concerted plan against him, Gibbs filed suit in federal court against the international UMW. He alleged an unlawful secondary boycott under the federal labor laws and, as a pendent state-law claim, "an unlawful conspiracy and an unlawful boycott aimed at him . . . to maliciously, wantonly and willfully interfere with his contract of employment and with his contract of haulage." *Id.*, at 720. The federal claim was dismissed on the ground that the dispute was "primary" and therefore not cognizable under the federal prohibition of secondary labor boycotts. Damages were awarded against the UMW, however, on the state claim of interference with an employment relationship.

This Court reversed. The Court found that the pleadings, arguments of counsel, and jury instructions had not ade-

quately defined the compass within which damages could be awarded under state law. The Court noted that it had "consistently recognized the right of States to deal with violence and threats of violence appearing in labor disputes" and had sustained "a variety of remedial measures against the contention that state law was pre-empted by the passage of federal labor legislation." *Id.*, at 729. To accommodate federal labor policy, however, the Court in *Gibbs* held: "the permissible scope of state remedies in this area is strictly confined to the direct consequences of such [violent] conduct, and does not include consequences resulting from associated peaceful picketing or other union activity." *Ibid.* The Court noted that in *Construction Workers* v. *Laburnum Construction Corp.*, 347 U. S. 656, damages were restricted to those directly and proximately caused by wrongful conduct chargeable to the defendants. "'Thus there [was] nothing in the measure of damages to indicate that state power was exerted to compensate for anything more than the direct consequences of the violent conduct.'" 383 U. S., at 730 (quoting *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, 249, n. 6).

The careful limitation on damages liability imposed in *Gibbs* resulted from the need to accommodate state law with federal labor policy. That limitation is no less applicable, however, to the important First Amendment interests at issue in this case. Petitioners withheld their patronage from the white establishment of Claiborne County to challenge a political and economic system that had denied them the basic rights of dignity and equality that this country had fought a Civil War to secure. While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity. Only those losses proximately caused by unlawful conduct may be recovered.

The First Amendment similarly restricts the ability of the State to impose liability on an individual solely because of his

association with another. In *Scales* v. *United States*, 367 U. S. 203, 229, the Court noted that a "blanket prohibition of association with a group having both legal and illegal aims" would present "a real danger that legitimate political expression or association would be impaired." The Court suggested that to punish association with such a group, there must be "clear proof that a defendant 'specifically intend[s] to accomplish [the aims of the organization] by resort to violence.'" *Ibid.* (quoting *Noto* v. *United States*, 367 U. S. 290, 299).[53] Moreover, in *Noto* v. *United States* the Court emphasized that this intent must be judged "according to the strictest law,"[54] for "otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share." *Id.*, at 299–300.

In *Healy* v. *James*, 408 U. S. 169, the Court applied these principles in a noncriminal context. In that case the Court held that a student group could not be denied recognition at a state-supported college merely because of its affiliation with a national organization associated with disruptive and violent campus activity. It noted that "the Court has consistently disapproved governmental action imposing criminal sanctions or denying rights and privileges solely because of a citizen's association with an unpopular organization." *Id.*, at 185–186. The Court stated that "it has been established that 'guilt by association alone, without [establishing] that an individual's association poses the threat feared by the Government,' is an impermissible basis upon which to deny First Amendment rights." *Id.*, at 186 (quoting *United States* v. *Robel*, 389 U. S. 258, 265). "The government has the bur-

---

[53] See *United States* v. *Robel*, 389 U. S. 258; *Elfbrandt* v. *Russell*, 384 U. S. 11; *Aptheker* v. *Secretary of State*, 378 U. S. 500.

[54] "*Strictissimi juris.*" 367 U. S., at 299.

den of establishing a knowing affiliation with an organization possessing unlawful aims and goals, and a specific intent to further those illegal aims." 408 U. S., at 186 (footnote omitted).[55]

The principles announced in *Scales*, *Noto*, and *Healy* are relevant to this case. Civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence. For liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims.[56] "In this sensitive field, the State may not employ 'means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.' *Shelton* v. *Tucker*, 364 U. S. 479, 488 (1960)." *Carroll* v. *Princess Anne*, 393 U. S. 175, 183–184.

### III

The chancellor awarded respondents damages for all business losses that were sustained during a 7-year period beginning in 1966 and ending December 31, 1972.[57] With the ex-

---

[55] In *Rizzo* v. *Goode*, 423 U. S. 362, the Court vacated an injunction, directed against an entire police department, that had resulted from 20 specific incidents of police misconduct. The Court held that such collective responsibility should be limited to instances in which a concerted design existed to accomplish a wrongful objective. *Id.*, at 373–376.

[56] Of course, the question whether an individual may be held liable for damages merely by reason of his association with others who committed unlawful acts is quite different from the question whether an individual may be held liable for unlawful conduct that he himself authorized or incited. See *infra*, at 925–926.

[57] It is noteworthy that the portion of the chancellor's opinion discussing damages begins by referring expressly to the two theories of liability that the Mississippi Supreme Court rejected:

"The complainants proved, in this record, that they suffered injury to their respective businesses as the direct and proximate result of the unlawful secondary boycott and the defendants' actions in restraining trade, all of

ception of Aaron Henry, all defendants were held jointly and severally liable for these losses. The chancellor's findings were consistent with his view that voluntary participation in the boycott was a sufficient basis on which to impose liability. The Mississippi Supreme Court properly rejected that theory; it nevertheless held that petitioners were liable for all damages "resulting from the boycott."[58] In light of the principles set forth above, it is evident that such a damages award may not be sustained in this case.

The opinion of the Mississippi Supreme Court itself demonstrates that all business losses were not proximately caused by the violence and threats of violence found to be present. The court stated that "coercion, intimidation, and threats" formed *"part* of the boycott activity" and *"contributed* to its almost complete success."[59] The court broadly asserted— without differentiation—that " '[i]ntimidation, threats, social ostracism, vilification, and traduction' " were devices used by the defendants to effectuate the boycott.[60] The court repeated the chancellor's finding that "the volition of *many* black persons was overcome out of sheer fear."[61] These findings are inconsistent with the court's imposition of all damages "resulting from the boycott." To the extent that the court's judgment rests on the ground that "many" black citizens were "intimidated" by "threats" of "social ostracism, vilification, and traduction," it is flatly inconsistent with the First Amendment. The ambiguous findings of the Mississippi Supreme Court are inadequate to assure the "precision of regulation" demanded by that constitutional provision.

---

which was accomplished by defendants through a conspiracy." App. to Pet. for Cert. 57b (footnote omitted).

In a footnote, the chancellor added that "any kind of boycott is unlawful if executed with force or violence or threats." *Id.*, at 57b, n. 21.

[58] 393 So. 2d, at 1307.

[59] *Id.*, at 1302 (emphasis added).

[60] *Id.*, at 1300 (quoting trial court; see App. to Pet. for Cert. 39b).

[61] 393 So. 2d, at 1300 (emphasis added).

The record in this case demonstrates that all of respondents' losses were not proximately caused by violence or threats of violence. As respondents themselves stated at page 12 of their brief in the Mississippi Supreme Court:

> "Most of the witnesses testified that they voluntarily went along with the NAACP and their fellow black citizens in honoring and observing the boycott because they wanted the boycott."

This assessment is amply supported by the record.[62] It is indeed inconceivable that a boycott launched by the unanimous vote of several hundred persons succeeded solely through fear and intimidation. Moreover, the fact that the boycott "intensified" following the shootings of Martin Luther King, Jr., and Roosevelt Jackson demonstrates that factors other than force and violence (by the petitioners) figured

---

[62] The testimony of Julia Johnson—although itself only a small portion of a massive record—perhaps best illustrates this point:

"Q. How did you observe the boycott?

"A. I just stayed out of the stores, because I had my own personal reasons to stay out of the stores. There were some things I really wanted, and the things I wanted were the right to vote, the right to have a title— Mrs. or Mr. or whatever I am, and not uncle or aunt, boy or girl. So that's what I wanted. And if I wanted a job—a qualified job, I wanted to have the opportunity to be hired. Not hired because I'm black or white, but just hired.

"Q. And this was your reason for observing the boycott?

"A. Yes, it was.

"Q. And you were in favor of the boycott?

"A. Yes, I was in favor of the boycott.

"Q. And it wasn't because somebody threatened you?

"A. No, it wasn't because nobody threatened me.

"Q. You weren't afraid?

"A. Was I afraid?

"Q. Yes.

"A. No, I was not afraid." Record 15476.

It is clear that losses were sustained because persons like Julia Johnson "wanted justice and equal opportunity." *Id.*, at 6864 (testimony of Margaret Liggins). See *id.*, at 6737, 12419, 13543–13544.

prominently in the boycott's success. The chancellor made no finding that any act of violence occurred after 1966. While the timing of the acts of violence was not important to the chancellor's imposition of liability, it is a critical factor under the narrower rationale of the Mississippi Supreme Court. That court has completely failed to demonstrate that business losses suffered in 1972—three years after this lawsuit was filed—were proximately caused by the isolated acts of violence found in 1966.[63] It is impossible to conclude that state power has not been exerted to compensate respondents for the direct consequences of nonviolent, constitutionally protected activity.

This case is not like *Milk Wagon Drivers* v. *Meadowmoor Dairies, Inc.*, 312 U. S. 287, in which the Court held that the presence of violence justified an injunction against both violent and nonviolent activity.[64] The violent conduct present in that case was pervasive.[65] The Court in *Meadowmoor* stated that "utterance in a context of violence can lose its significance as an appeal to reason and become part of an instrument of force." *Id.*, at 293. The Court emphasized, however:

---

[63] It is also noteworthy that virtually every victim of the acts of violence found by the chancellor testified that he or she continued to patronize the white merchants. See *supra*, at 904, and n. 37.

[64] In *Mine Workers* v. *Gibbs*, 383 U. S. 715, the Court stated that if "special facts" such as those presented in *Meadowmoor* "appeared in an action for damages after picketing marred by violence had occurred," they might "support the conclusion that all damages resulting from the picketing were proximately caused by its violent component or by the fear which that violence engendered." 383 U. S., at 731–732.

[65] As described by the Court: "Witnesses testified to more than fifty instances of windowsmashing; explosive bombs caused substantial injury to the plants of Meadowmoor and another dairy using the vendor system and to five stores; stench bombs were dropped in five stores; three trucks of vendors were wrecked, seriously injuring one driver, and another was driven into a river; a store was set on fire and in large measure ruined; two trucks of vendors were burned; a storekeeper and a truck driver were severely beaten; workers at a dairy which, like Meadowmoor, used the ven-

> "Still it is of prime importance that no constitutional freedom, least of all the guarantees of the Bill of Rights, be defeated by insubstantial findings of fact screening reality. That is why this Court has the ultimate power to search the records in the state courts where a claim of constitutionality is effectively made. And so the right of free speech cannot be denied by drawing from a trivial rough incident or a moment of animal exuberance the conclusion that otherwise peaceful picketing has the taint of force." *Ibid.*

Such "insubstantial findings" were not present in *Meadowmoor*. But in this case, the Mississippi Supreme Court has relied on isolated acts of violence during a limited period to uphold respondents' recovery of *all* business losses sustained over a 7-year span. No losses are attributed to the voluntary participation of individuals determined to secure "justice and equal opportunity."[66] The court's judgment "screens reality" and cannot stand.[67]

Respondents' supplemental brief also demonstrates that on the present record no judgment may be sustained against most of the petitioners. Regular attendance and participation at the Tuesday meetings of the Claiborne County Branch of the NAACP is an insufficient predicate on which to impose liability. The chancellor's findings do not suggest that any illegal conduct was authorized, ratified, or even discussed at any of the meetings. The Sheriff testified that he was kept

---

dor system were held with guns and severely beaten about the head while being told 'to join the union'; carloads of men followed vendors' trucks, threatening the drivers, and in one instance shot at the truck and driver." 312 U. S., at 291–292.

[66] See n. 62, *supra.*

[67] For the same reasons, the permanent injunction entered by the chancellor must be dissolved. Since the boycott apparently has ended, the Mississippi Supreme Court may wish to vacate the entire injunction on the ground that it is no longer necessary; alternatively, the injunction must be modified to restrain only unlawful conduct and the persons responsible for conduct of that character.

informed of what transpired at the meetings; he made no reference to any discussion of unlawful activity.[68]   To impose liability for presence at weekly meetings of the NAACP would—ironically—not even constitute "guilt by association," since there is no evidence that the association possessed unlawful aims.   Rather, liability could only be imposed on a "guilt *for* association" theory.   Neither is permissible under the First Amendment.[69]

Respondents also argue that liability may be imposed on individuals who were either "store watchers" or members of the "Black Hats."   There is nothing unlawful in standing outside a store and recording names.   Similarly, there is nothing unlawful in wearing black hats, although such apparel may cause apprehension in others.   As established above, mere association with either group—absent a specific intent to further an unlawful aim embraced by that group—is

---

[68] See Record 1172.   The strongest evidence of wrongdoing at the meetings was presented by petitioner Marjorie Brandon, who served at times as the local NAACP secretary.   She testified that "in the meetings there were statements saying that you would be dealt with" if found trading in boycotted stores.   *Id.*, at 5637.   She stated that she understood "dealt with" to mean "they would take care of you, do something to you, if you were caught going in."   *Ibid.*   Her testimony does not disclose who made the statements, how often they were made, or that they were in any way endorsed by others at the meetings.   A massive damages judgment may not be sustained on the basis of this testimony; the fact that certain anonymous persons made such statements at some point during a 7-year period is insufficient to establish that the Association itself possessed unlawful aims or that any petitioner specifically intended to further an unlawful goal.

[69] A legal duty to "repudiate"—to disassociate oneself from the acts of another—cannot arise unless, absent the repudiation, an individual could be found liable for those acts.   As our decisions in *Scales, Noto*, and *Healy* make clear, see *supra*, at 920, civil liability may not be imposed merely because an individual belonged to a group, some members of which committed acts of violence.   The chancellor in this case made no finding that the individuals who committed those acts of violence were "agents" or "servants" of those who attended the NAACP meetings; certainly such a relationship cannot be found simply because both shared certain goals.   Cf. *General Building Contractors Assn.* v. *Pennsylvania, ante,* at 391–395.

an insufficient predicate for liability. At the same time, the evidence does support the conclusion that some members of each of these groups engaged in violence or threats of violence. Unquestionably, these individuals may be held responsible for the injuries that they caused; a judgment tailored to the consequences of their unlawful conduct may be sustained.

Respondents have sought separately to justify the judgment entered against Charles Evers and the national NAACP. As set forth by the chancellor, Evers was specially connected with the boycott in four respects. First, Evers signed the March 23 supplemental demand letter and unquestionably played the primary leadership role in the organization of the boycott. Second, Evers participated in negotiations with MAP and successfully convinced MAP to abandon its practice of purchasing food alternately from white-owned and black-owned stores. Third, he apparently presided at the April 1, 1966, meeting at which the vote to begin the boycott was taken; he delivered a speech to the large audience that was gathered on that occasion. See n. 28, *supra*. Fourth, Evers delivered the speeches on April 19 and 21, 1969, which we have discussed previously. See *supra*, at 902; Appendix to this opinion.

For the reasons set forth above, liability may not be imposed on Evers for his presence at NAACP meetings or his active participation in the boycott itself. To the extent that Evers caused respondents to suffer business losses through his organization of the boycott, his emotional and persuasive appeals for unity in the joint effort, or his "threats" of vilification or social ostracism, Evers' conduct is constitutionally protected and beyond the reach of a damages award. Respondents point to Evers' speeches, however, as justification for the chancellor's damages award. Since respondents would impose liability on the basis of a public address—which predominantly contained highly charged political rhetoric

lying at the core of the First Amendment—we approach this suggested basis of liability with extreme care.

There are three separate theories that might justify holding Evers liable for the unlawful conduct of others. First, a finding that he authorized, directed, or ratified specific tortious activity would justify holding him responsible for the consequences of that activity. Second, a finding that his public speeches were likely to incite lawless action could justify holding him liable for unlawful conduct that in fact followed within a reasonable period. Third, the speeches might be taken as evidence that Evers gave other specific instructions to carry out violent acts or threats.

While many of the comments in Evers' speeches might have contemplated "discipline" in the permissible form of social ostracism, it cannot be denied that references to the possibility that necks would be broken and to the fact that the Sheriff could not sleep with boycott violators at night implicitly conveyed a sterner message. In the passionate atmosphere in which the speeches were delivered, they might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence whether or not improper discipline was specifically intended.

It is clear that "fighting words"—those that provoke immediate violence—are not protected by the First Amendment. *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572. Similarly, words that create an immediate panic are not entitled to constitutional protection. *Schenck* v. *United States,* 249 U. S. 47.[70] This Court has made clear, however, that mere *advocacy* of the use of force or violence does not remove speech from the protection of the First Amendment. In *Brandenburg* v. *Ohio,* 395 U. S. 444, we reversed the conviction of a Ku Klux Klan leader for threatening "revengeance" if the "suppression" of the white race continued; we relied on

---

[70] "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." 249 U. S., at 52.

"the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.*, at 447. See *Noto* v. *United States*, 367 U. S., at 297–298 ("the mere abstract teaching . . . of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action"). See also *Whitney* v. *California*, 274 U. S. 357, 372 (Brandeis, J., concurring).

The emotionally charged rhetoric of Charles Evers' speeches did not transcend the bounds of protected speech set forth in *Brandenburg*. The lengthy addresses generally contained an impassioned plea for black citizens to unify, to support and respect each other, and to realize the political and economic power available to them. In the course of those pleas, strong language was used. If that language had been followed by acts of violence, a substantial question would be presented whether Evers could be held liable for the consequences of that unlawful conduct. In this case, however—with the possible exception of the Cox incident—the acts of violence identified in 1966 occurred weeks or months after the April 1, 1966, speech; the chancellor made no finding of any violence after the challenged 1969 speech. Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore the "profound national commitment" that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co.* v. *Sullivan*, 376 U. S., at 270.[71]

---

[71] In *Watts* v. *United States*, 394 U. S. 705, the petitioner was convicted of willfully making a threat to take the life of the President. During a pub-

For these reasons, we conclude that Evers' addresses did not exceed the bounds of protected speech. If there were other evidence of his authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence. But any such theory fails for the simple reason that there is no evidence—apart from the speeches themselves—that Evers authorized, ratified, or directly threatened acts of violence.[72] The chancellor's findings are not sufficient to establish that Evers had a duty to "repudiate" the acts of violence that occurred.[73] The findings are constitutionally inadequate to support the damages judgment against him.

The liability of the NAACP derived solely from the liability of Charles Evers.[74] The chancellor found:

> "The national NAACP was well-advised of Evers' actions, and it had the option of repudiating his acts or ratifying them. It never repudiated those acts, and therefore, it is deemed by this Court to have affirmed them." App. to Pet. for Cert. 42b–43b.

---

lic rally at the Washington Monument, petitioner stated in a small discussion group:

" 'They always holler at us to get an education. And now I have already received my draft classification as 1–A and I have got to report for my physical this Monday coming. I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L. B. J.' " *Id.*, at 706.

This Court summarily reversed. The Court agreed with the petitioner that the statement, taken in context, was "a kind of very crude offensive method of stating a political opposition to the President." *Id.*, at 708.

[72] There is evidence that Evers occasionally served as a "store watcher," but there is no suggestion that anything improper occurred on those occasions.

[73] See n. 69, *supra*.

[74] Indeed it is noteworthy that Aaron Henry—who was president of the Mississippi State Conference of the NAACP, president of the Coahoma County Branch of the NAACP, and a member of the Board of Directors of the national NAACP—was the only defendant dismissed by the chancellor on the merits.

Of course, to the extent that Charles Evers' acts are insufficient to impose liability upon him, they may not be used to impose liability on his principal. On the present record, however, the judgment against the NAACP could not stand in any event.

The associational rights of the NAACP and its members have been recognized repeatedly by this Court.[75] The NAACP—like any other organization—of course may be held responsible for the acts of its agents throughout the country that are undertaken within the scope of their actual or apparent authority.[76] Cf. *American Society of Mechanical Engineers, Inc.* v. *Hydrolevel Corp.*, 456 U. S. 556. Moreover, the NAACP may be found liable for other conduct of which it had knowledge and specifically ratified.

The chancellor made no finding that Charles Evers or any other NAACP member had either actual or apparent authority to commit acts of violence or to threaten violent conduct. The evidence in the record suggests the contrary. Aaron Henry, President of the Mississippi State Conference of the NAACP and a member of the Board of Directors of the national organization, testified that the statements attributed to Evers were directly contrary to NAACP policy. Record 4930.[77] Similarly, there is no evidence that the NAACP rati-

---

[75] Cf. *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449; *Bates* v. *Little Rock*, 361 U. S. 516; *Louisiana ex rel. Gremillion* v. *NAACP*, 366 U. S. 293; *NAACP* v. *Button*, 371 U. S. 415; *Gibson* v. *Florida Legislative Investigation Committee*, 372 U. S. 539; *NAACP* v. *Alabama ex rel. Flowers*, 377 U. S. 288.

[76] There is no question that Charles Evers—as its only paid representative in Mississippi—was an agent of the NAACP.

[77] In a footnote to his discussion of the NAACP's liability, the chancellor wrote:

"Aaron E. Henry, a prominent black leader in the State of Mississippi, who was president of the Mississippi State Conference of the NAACP, president of the Coahoma County Branch of the NAACP, and a member of the Board of Directors of the national NAACP, testified that the NAACP 'absolutely did not approve of the way the boycott was being conducted in Port Gibson.' There is also evidence in the record tending to show that

fied—or even had specific knowledge of—any of the acts of violence or threats of discipline associated with the boycott. Henry testified that the NAACP never authorized, and never considered taking, any official action with respect to the boycott. *Id.*, at 4896. The NAACP supplied no financial aid to the boycott. *Id.*, at 4940. The chancellor made no finding that the national organization was involved in any way in the boycott.[78]

To impose liability without a finding that the NAACP authorized—either actually or apparently—or ratified unlawful conduct would impermissibly burden the rights of political association that are protected by the First Amendment. As Justice Douglas noted in *NAACP* v. *Overstreet*, 384 U. S. 118, dissenting from a dismissal of a writ of certiorari found to have been improvidently granted:

"To equate the liability of the national organization with that of the Branch in the absence of any proof that the national authorized or ratified the misconduct in question could ultimately destroy it. The rights of political association are fragile enough without adding the

Evers was called to account by the national NAACP because of the manner in which the boycott was conducted. However, the NAACP took no action whatever to curb Evers' activities in this connection." App. to Pet. for Cert. 42b, n. 9.

Henry's testimony concerning Evers' having been "called to account by the National NAACP" concerned Evers' failure to make proper reports and Henry's understanding that there was a personality clash between Evers and an executive of the NAACP. Record 4905, 4907. We have found no evidence in the record that any representative of the national NAACP was advised of any facts concerning the manner in which the Port Gibson boycott was conducted.

[78] The chancellor did find that the NAACP had posted bond and provided legal representation for arrested boycott violators. Since the NAACP regularly provides such assistance to indigent black persons throughout the country, this finding cannot support a determination that the national organization was aware of, and ratified, unauthorized violent conduct. Counsel for respondents does not contend otherwise.

additional threat of destruction by lawsuit. We have not been slow to recognize that the protection of the First Amendment bars subtle as well as obvious devices by which political association might be stifled. See *Bates* v. *Little Rock*, 361 U. S. 516, 523. Thus we have held that forced disclosure of one's political associations is, at least in the absence of a compelling state interest, inconsistent with the First Amendment's guaranty of associational privacy. *E. g., DeGregory* v. *New Hampshire*, 383 U. S. 825; *Gibson* v. *Florida Legislative Comm.*, 372 U. S. 539, 543–546; *Shelton* v. *Tucker*, 364 U. S. 479; *N. A. A. C. P.* v. *Alabama*, 357 U. S. 449, 462–463. Recognizing that guilt by association is a philosophy alien to the traditions of a free society (see *Schware* v. *Board of Bar Examiners*, 353 U. S. 232, 245–246, and the First Amendment itself, we have held that civil or criminal disabilities may not be imposed on one who joins an organization which has among its purposes the violent overthrow of the Government, unless the individual joins knowing of the organization's illegal purposes (*Wieman* v. *Updegraff*, 344 U. S. 183) and with the specific intention to further those purposes. See *Elfbrandt* v. *Russell*, [384 U. S., at] 11; *Aptheker* v. *Secretary of State*, 378 U. S. 500." *Id.*, at 122.

The chancellor's findings are not adequate to support the judgment against the NAACP.

## IV

In litigation of this kind the stakes are high. Concerted action is a powerful weapon. History teaches that special dangers are associated with conspiratorial activity.[79] And

---

[79] In discussing the doctrine of criminal conspiracy, Justice Jackson noted:

"The crime comes down to us wrapped in vague but unpleasant connotations. It sounds historical undertones of treachery, secret plotting and violence on a scale that menaces social stability and the security of the state

yet one of the foundations of our society is the right of individuals to combine with other persons in pursuit of a common goal by lawful means.[80]

At times the difference between lawful and unlawful collective action may be identified easily by reference to its purpose. In this case, however, petitioners' ultimate objectives were unquestionably legitimate. The charge of illegality— like the claim of constitutional protection—derives from the means employed by the participants to achieve those goals. The use of speeches, marches, and threats of social ostracism cannot provide the basis for a damages award. But violent conduct is beyond the pale of constitutional protection.

The taint of violence colored the conduct of some of the petitioners. They, of course, may be held liable for the consequences of their violent deeds. The burden of demonstrating that it colored the entire collective effort, however, is not satisfied by evidence that violence occurred or even that violence contributed to the success of the boycott. A massive and prolonged effort to change the social, political, and economic structure of a local environment cannot be characterized as a violent conspiracy simply by reference to the ephemeral consequences of relatively few violent acts. Such a characterization must be supported by findings that adequately disclose the evidentiary basis for concluding that specific parties agreed to use unlawful means, that carefully

---

itself. 'Privy conspiracy' ranks with sedition and rebellion in the Litany's prayer for deliverance. Conspiratorial movements do indeed lie back of the political assassination, the *coup d'etat*, the *putsch*, the revolution, and seizures of power in modern times, as they have in all history." *Krulewitch* v. *United States*, 336 U. S., at 448 (concurring opinion).

[80] "The most natural privilege of man, next to the right of acting for himself, is that of combining his exertions with those of his fellow creatures and of acting in common with them. The right of association therefore appears to me almost as inalienable in its nature as the right of personal liberty. No legislator can attack it without impairing the foundations of society." 1 A. de Tocqueville, Democracy in America 203 (P. Bradley ed. 1954).

identify the impact of such unlawful conduct, and that recognize the importance of avoiding the imposition of punishment for constitutionally protected activity. The burden of demonstrating that fear rather than protected conduct was the dominant force in the movement is heavy. A court must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless freestanding trees. The findings of the chancellor, framed largely in the light of two legal theories rejected by the Mississippi Supreme Court, are constitutionally insufficient to support the judgment that all petitioners are liable for all losses resulting from the boycott.

The judgment is reversed. The case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE REHNQUIST concurs in the result.

JUSTICE MARSHALL took no part in the consideration or decision of this case.

APPENDIX TO OPINION OF THE COURT

Portions of speech delivered by Charles Evers on April 19, 1969 (Record 1092–1108):

"Thank you very much. We want our white friends here to know what we tell them happens to be so. Thank you for having the courage to walk down those streets with us. We thank you for letting our white brethren know that guns and bullets ain't gonna stop us. (No) (No) We thank you for letting our white brothers know that Port Gibson ain't none of their town. (Amen) (Applause) That Port Gibson is all of our town. (Applause) That black folks, red folks, Chinese and Japanese alike (Yeah) (That's right.), that we are going to have our share. (Yeah, we are.)

.     .     .     .     .

"We are going to beat you because we know you can't trick us no more. (yea) You are not going to be able to fool us by getting somebody to give us a drink of whiskey no more. (Applause) You ain't gonna be able to fool us by somebody giving us a few dollars no more. (Applause) We are gonna take your money and drink with you and then we're gonna (Applause) vote against you. Then we are going to elect a sheriff in this county and a sheriff that is responsible, that won't have to run and grab the telephone and call up the blood-thirsty highway patrol when he gets ready (Yeah) to come in and beat innocent folks down to the ground for no cause. (That's right) (Applause) (Boo) We are going to elect a sheriff that can call his deputies and represent black leaders in the community and stop whatever problem there is. (Yeah) (That's right.)

"Then we are going to do more than that. The white merchants of this town are so wrapped up in the power structure here, since you love your Police Department so well, since you support them so well (Yeah), we are going to let them buy your dirty clothes and your filthy, rotten groceries.

"Oh, no, white folks, we ain't going to shoot you with no bullet. (That's right.) We are going to shoot you with our ballots and with our bucks. (Yea) (That's right.) We are going to take away from you the thing that you have had over us all these years. (Yeah) Political power and economic power. While you kill our brothers and our sisters and rape our wives and our friends. (Yeah) You're guilty. You're guilty because you don't care a thing about anybody. (Yes.) And when you go and let a big, black burly nigger like you get on the police force (Yea) go down and grab another black brother's arm and hold it while a white racist stole him from us, and he's a liar if he says he didn't hold him.

.        .        .        .        .

"We mean what we are saying. We are not playing. (Right) We better not even think one of us is black. You better not even be caught near one of these stores. (Applause)

"We don't want you caught in Piggly-Wiggly. You remember how he grinned at us four years ago? (Yeah) You know how when he took office he grinned at us? (Yeah) He ain't hired nobody yet. (That's right) (No) And you know old Jitney Jungle down there with those funny letters down on the end? (That's right) (Applause) He haven't hired nobody in there yet. (No) Do you know poor ole M & M or whatever it stands for, mud and mush, I guess. (Applause) They're out here on the highway and they haven't hired none of us yet.

"Do you know Ellis who had a part-time boy all his life? He ain't hired nobody, is he, yet? (No) Then we got ole Stampley, and ninety-nine and three-fourths of his sales are black folks business. He got the nerve to tell me he ain't gonna put no nigger ringing his cash register. I got news for you, Brother Stampley. You can ring it your damn self. (Extra loud applause.) I want some of you fat cats after this meeting who wants three of our young boys who ain't a'scar'd of white folks (Applause) (Me) and we want you that's willing to follow the rules now to go down by Brother Stampley's and serve notice on him with our placards that we ain't coming no more.

"Then we are going to tell all the young men that drive Piggly-Wiggly trucks now (Yeah) (Be careful, Son.) because the soul brothers and the spirit is watching you. (Extra loud applause.)

"All right, Brother Wolf, you're next. (Applause) We got a couple of 'em to come down by Brother Wolf's. We mean business, white folks. We ain't gonna shoot you all, we are going to hit you where it hurts most. (In the pocketbook) (Applause) In the pocketbook and in the ballot box. (Applause) We may as well tell our friends at Alcorn to stay away from up here. (Yea) Now, you say, 'What's wrong with you niggers?' I'll tell you what is wrong with us niggers; We are tired of you white folks, you racists and you bigots mistreating us. (Yeah) We are tired of paying you to

deny us the right to even exist. (Tell 'em about it.) And we ain't coming back, white folks. (We ain't.)

"You all put a curfew on us at eight o'clock tonight. We are going to do you better than that. We are going to leave at one-thirty. (Loud applause) We are going to leave at one-thirty and we ain't coming back, white folks.

.          .          .          .          .

"We are going to have Brother McCay; we are going to have our newly elected mayor who we elected, we are going to have him around here, too. Come on back, my dear friend. He say, 'Naw, brother, we ain't coming.' 'Have you got rid of all those bigots you got on your police force?' 'No.' 'Have you hired Negroes in all them stores?' 'No.' 'Well, we ain't coming back.' (Right) That's all we gonna do. You know, what they don't realize is you put on this curfew, that is all we needed. Let me just give them some instructions. We are going to buy gas only from the Negro-owned service stations. We agreed on it, remember? Now, don't back upon your agreement. (Yea) I don't care how many Negroes working on it, that's too bad. We are going only to Negro-owned service stations. And we are going only—the only time you will see us around on this street, now listen good, you are going to Lee's Grocery and other stores on this end. Is that clear? (Yeah) (Applause)

"We don't want to go to none of them drugstores. They get us confused. Now, who am I going to get my medicine from? Let us know in time and we will be glad to furnish a car free to carry you anywhere you have to go to get a prescription filled. You can't beat this. (No) It won't cost you a dime. You go to any of the local black businessmen and tell them you have got to go to Vicksburg to get your stuff. And then if they don't carry you, let us know. We'll take care of them later. (Applause) Now, you know, we have got a little song that says, 'This is your thing, do what you want to do.' (Applause) This is our thing, let's do what we want to do with it. Let's make sure now—if you be dis-

obedient now you are going to be in trouble. Remember that, now, listen. Listen good. They are going to start saying, 'You know what, Evers is down there with his goon squad, . . .' Now, we know Claiborne County,—'with his goon squad harassing poor ole niggers.'

"Well, good white folks you have been harassing us all our lives. (Applause) And if we decided to harass you that's our business. (That's right) They are our children and we are going to discipline them the way we want to. Now, be sure you get all this right on all these tape recorders. Whatever I say on this trip I will say it in Jackson. (Amen) (Glory) And I will say it in Washington and New York. White folks ain't gonna never control us no more. (Applause)

.          .          .          .          .

"Now, my dear friends, the white folks have got the message. I hope you have got the message and tell every one of our black brothers until all these people are gone, you voted on this in the church, don't let me down, and don't let yourself down. We agreed in the church that we would vacate this town until they have met those requests, the white folks don't demand nothing out of us. All right, white folks, we are just saying until you decide when you want to do these little things we beg of you, we are not coming back. (No way)

"None of us better not be caught up here. (Yea) I don't care how old you are, I don't care how sick you are, I don't care how crazy you are, you better not be caught on these streets shopping in these stores until these demands are met. (Applause)

"Now, let's get together. Are you for this or against it? (Applause) (For it.) Remember you voted this. We intend to enforce it. You needn't go calling the chief of police, he can't help you none. You needn't go calling the sheriff, he can't help you none. (That's right.) He ain't going to offer

to sleep with none of us men, I can tell you that.   (Applause) Let's don't break our little rules that you agreed upon here.

.          .          .          .          .

"Let's go to the funeral of our young son whenever the funeral is.   I don't want you to come with hate because that is not going to solve our problems.   (No hate.)   We don't want you to hate the white folks here in Port Gibson.   That is not going to solve it.   If you hate what they have done, I hate to get personal, I hate what they did so much to Medgar, (I know.) I ain't going to ever stop hating them for that.   But I am going to chase them in the way what I know is right and just.   I am not going to lay out in the bushes and shoot no white folks.   That's wrong.   I am not gonna go out here and bomb none of them's home.   (No)   That's not right.   But I am going to do everything in my power to take away all the power, political power, legal power that they possess anywhere I live.   We are going to compete against them. When we blacks learn to support and respect each other, then and not until then, will white folks respect us. (Applause)

"Now, you know I trust white folks and I mean every word I say.   But it comes a time when we got to make up in our mind individually, are we going to make those persons worthwhile.   We done talked and raised all kind of sand all day here, now, what is really going to prove it, are we going to live up to what we have said?   (Applause)   Now if there is any one of us breaks what we agreed upon, you are just as guilty as that little trigger-happy, blood-thirsty rascal.   (Tell 'em about it.)

.          .          .          .          .

"I go all over this country, and I ought not to tell you white folks this, and I tell other white folks that some day we are going to get together in Mississippi, black and white, and work out our problems.   And we are ready to start whenever you are.   If you are ready to start, we are.   We ain't

going to let you push us, not one inch. (That's right.) If you come on beating us, we are going to fight back. (Right) We got our understanding. We are all God's children. The same man that brought you all here brought us. You could have been black just like we are. We could have been white and baldheaded just like you are. (Laughter) (Inaudible) We are going to work hard at this, Dan. We are going to be organized this time. We ain't going to be bought off and talked off. We are going to elect the county sheriff here this next time that don't need the highway patrol. Now, you see, Dan had a good chance to set himself up right, but he goofed it. He goofed. (Yeah) He blew it. (Laughter) Don't forget that, heah. (Right) It brings back memories like you know you remember things we do.

"Now, if you don't think it is necessary, we don't have to go back to the church. If you want to go back there, we can. I want you to make sure here that we are going to leave this town to our white brothers and we ain't coming back no more until all our requests have been met. Is that the common consent of all of you here? (Applause) (Let's go back to the church.) All right. Are we willing to make sure that everyone of us will be sure that none of the rest of our black brothers violate our . . . (Yea) We are all saying it now. Let's not say it now so much on my part. You know, I'm just sort of leading, you know, how these lawyers are, leading our folks on to say what has to be said. And that's the case. Let's make us a white town. We would like for you to start it. Be courteous now. Don't mistreat nobody. Tell them, in a nice forceful way, the curfew is going to be on until they do what we ask them."