*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re KJL.

ARM,

        Petitioner-Appellee,

v

KJL,

        Respondent-Appellant.

UNPUBLISHED
July 27, 2023

Nos. 361898; 362062
St. Clair Circuit Court
LC No. 20-001291-PP

Before: GADOLA, P.J., and MURRAY and MALDONADO, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent appeals as of right two sentencing orders arising from respondent's criminal-contempt convictions for violating a domestic personal protection order (PPO), MCL 600.2950(23). In Docket No. 361898, respondent appeals the trial court's January 4, 2022 order sentencing him to 93 days in jail. In Docket No. 362062, respondent appeals the trial court's October 15, 2021 order likewise sentencing him to 93 days in jail. We remand for correction of both orders to omit the provisions precluding statutory good-time credit, but affirm in all other respects.

## I. BACKGROUND

The parties have an acrimonious history surrounding custody of their daughter, which has led to substantial litigation concerning PPOs petitioner obtained and respondent's violations of those PPOs. See *ARM v KJL*, ___ Mich App ___ ; ___ NW2d ___ (2022) (Docket Nos. 357120, 358858, and 358859). Petitioner obtained a third PPO against respondent KJL in August 2020.

---

[1] *In re KJL*, unpublished order of the Court of Appeals, entered July 12, 2022 (Docket Nos. 361898 and 362062).

The sentence at issue in Docket No. 361898 stems from a show-cause order entered on August 31, 2020. Petitioner's underlying motion alleged, in pertinent part, that respondent posted a copy of the PPO the court had issued earlier that month, which contained petitioner's phone number, on Facebook. In the caption for the post respondent wrote, "Should have left the cell numbers off of the petition, dummies." Petitioner thereafter received threatening and harassing phone calls and text messages from strangers.[2] The trial court then ordered respondent to appear for a show-cause hearing. After respondent failed to appear, the trial court entered a bench warrant requiring that respondent be brought before the court or released on a $5,000 cash or surety bond. Respondent posted bond shortly thereafter and appeared in court on November 5, 2020. An evidentiary hearing was scheduled for January 22, 2021.

In the meantime, petitioner filed a second show-cause motion on January 7, 2021, this time alleging that respondent continued to send her text messages and make inappropriate posts on Facebook. Petitioner attached several text messages and Facebook posts to her motion. The sentence relating to this motion is at issue in Docket No. 362062. The trial court issued a bench warrant requiring respondent's arrest and appearance to answer the contempt charge, with no option for bond. Respondent failed to appear for the January 22, 2021 hearing. Consequently, the trial court ordered that respondent's release be revoked and bond be forfeited. It also entered another bench warrant without an option for bond.

Respondent was taken into custody on March 3, 2021, on the basis of the two bench warrants, a third bench warrant issued in this case, and two additional bench warrants issued in a different case. One warrant concerned respondent's failure to submit himself to the jail to serve a 60-day sentence imposed in another case, and respondent was ordered to begin serving that sentence the following day with credit for one day already served in jail. Respondent was arraigned on the remaining warrants on March 10, 2021, and bond was set at $10,000 cash or surety on each matter.

On June 4, 2021, the trial court held an evidentiary hearing regarding the show-cause order entered on August 31, 2020, which alleged respondent violated the PPO when he posted it to Facebook and then subsequently posted screen shots of respondent's text messages to petitioner that included petitioner's phone number. The trial court found respondent guilty of violating the terms of the PPO in an opinion and order dated December 14, 2021. On January 4, 2022, respondent was sentenced to 93 days in jail to run concurrent with the balance of an October 15, 2021, sentence he was then serving, without the ability to earn good-time credit and without credit for time served.

---

[2] Respondent operates a Facebook group entitled "Through My Eyes," to share details of his custody dispute and related dealings with the court. The group was mentioned in this Court's previous opinion by its former name, "Justice for O." *ARM*, ___ Mich App at ___; slip op at 1. According to respondent, he also uses the Facebook page/group to advocate for the rights of other fathers, protection of children, and to seek accountability from government officials. Through My Eyes purportedly has more than 10,000 followers.

On June 25, 2021, the trial court held an evidentiary hearing regarding the show-cause order entered on January 7, 2021, which alleged respondent violated the August 2020 PPO when he texted respondent on three separate dates. The trial court found respondent guilty of violating this PPO in an opinion and order dated September 29, 2021. On October 15, 2021, respondent was sentenced to 93 days jail on this violation to run concurrent with the balance of the July 29, 2021 sentence he was then serving and without the ability to earn good-time credit and without credit for time served.

## II. FREEDOM OF SPEECH

Respondent first argues that his December 14, 2021 conviction and related sentence must be vacated because the PPO is a public record and posting it to Facebook was protected free speech that could not serve as the basis for a PPO violation. We disagree.

A person who fails to comply with a domestic PPO issued under MCL 600.2950 is subject to the criminal-contempt powers of the court. MCL 600.2950(23). A trial court's decision to hold a party in contempt is reviewed for an abuse of discretion. *In re JCB*, 336 Mich App 736, 747; 971 NW2d 705 (2021). An abuse of discretion occurs when "the trial court's decision is outside the range of principled outcomes." *Porter v Porter*, 285 Mich App 450, 455; 776 NW2d 377 (2009). Underlying constitutional questions are reviewed de novo as questions of law. *TM v MZ (On Remand)*, 326 Mich App 227, 236; 926 NW2d 900 (2018).

Among other restrictions, the 2020 PPO prohibited respondent from stalking petitioner, as defined in MCL 750.411h, or posting messages through any medium of communication in violation of MCL 750.411s. As MCL 750.411s is most directly implicated by respondent's conduct in this case, our analysis will focus on that statute.

MCL 750.411s(1) provides:

> A person shall not post a message through the use of any medium of communication, including the internet or a computer, computer program, computer system, or computer network, or other electronic medium of communication, without the victim's consent, if all of the following apply:
>
> (a) The person knows or has reason to know that posting the message could cause 2 or more separate noncontinuous acts of unconsented contact with the victim.
>
> (b) Posting the message is intended to cause conduct that would make the victim feel terrorized, frightened, intimidated, threatened, harassed, or molested.
>
> (c) Conduct arising from posting the message would cause a reasonable person to suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested.
>
> (d) Conduct arising from posting the message causes the victim to suffer emotional distress and to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

-3-

It is clear from the statutory language that MCL 750.411s focuses on "the conduct the actor intended to cause by posting the message and the effect of that conduct." *Buchanan v Crisler*, 323 Mich App 163, 179; 922 NW2d 886 (2018). As this Court explained in *Buchanan*, the elements of the statute demonstrate that it was designed to bar "cyberstalking by proxy" or "cyberharassing by proxy." *Id.* By its express terms, however, MCL 750.411s "does not prohibit constitutionally protected speech or activity." MCL 750.411s(6).

Respondent posted petitioner's PPO petition and the PPO itself on Facebook, along with the caption, "Should have left the cell numbers off of the petition, dummies." The next day, respondent made a second Facebook post that shared text messages between the parties, and some of the screen shots again included petitioner's name and phone number. Respondent posted these on his Through My Eyes Facebook group, which contained years of content disparaging petitioner and that she believed had caused its followers to hate and harass her. Shortly after respondent's posts, petitioner began receiving hateful, threatening, and cryptic text messages from strangers.

The trial court found that respondent violated both MCL 750.411h and MCL 750.411s by posting petitioner's phone number on his Through My Eyes page, reasoning that respondent obviously intended to have his followers contact her. The trial court further stated that it believed respondent's post was part of his continuing harassment of petitioner. The trial court was unpersuaded by respondent's constitutional defense because speech integral to the commission of a crime is not protected by the First Amendment and, in the trial court's view, that exception applied because neither petitioner nor the parties' daughter were public figures and the parties' custody dispute was not a matter of public concern. Respondent maintains on appeal that his posts involved constitutionally protected speech that could not serve as the basis for a contempt conviction.

The right to freedom of speech is protected by both the federal and state constitutions. US Const, Ams I and XIV; Const 1963, art 1, § 5. Freedom of speech protects "speech over the Internet to the same extent as speech over other media." *Thomas M Cooley Law Sch v Doe 1*, 300 Mich App 245, 256; 833 NW2d 331 (2013). But as this Court noted in respondent's previous appeals, "a person's right to free speech must be understood in light of another person's interest in being left alone." *ARM*, ___ Mich App at ___; slip op at 8. "The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases." *Id.* at ___; slip op at 8, quoting *Hill v Colorado*, 530 US 703, 716; 120 S Ct 2480; 147 L Ed 2d 597 (2000). While the freedom to communicate is substantial, the right of every person to be left alone must be balanced with the right of others to communicate. *Id.* quoting *Hill*, 530 US at 718.

The right to speak freely is not without limitation. The First Amendment permits restrictions upon the content of speech in a few limited areas. *TM*, 326 Mich App at 238. "Among these categories are advocacy intended, and likely, to incite imminent lawless action; obscenity; defamation; speech integral to criminal conduct; so-called 'fighting words'; child pornography; fraud; true threats; and speech presenting some grave and imminent threat the government has the power to prevent . . . ." *United States v Alvarez*, 567 US 709, 717; 132 S Ct 2537; 183 L Ed 2d 574 (2012) (citations omitted).

Respondent relies principally on this Court's opinion in *TM*, 326 Mich App 227, and United States Supreme Court precedent cited in that opinion, namely, *Org for a Better Austin v*

*Keefe*, 402 US 415; 91 S Ct 1575; 29 L Ed 2d 1 (1971) and *NAACP v Claiborne Hardware Co*, 458 US 886; 102 S Ct 3409; 73 L Ed 2d 1215 (1982). Respondent's reliance on these authorities is flawed, however, because none address the First Amendment exception at the heart of the trial court's decision—speech integral to criminal conduct. *TM*, 326 Mich App at 243, explicitly limited its analysis to only four exceptions—defamation, fighting words, words inciting imminent lawless action, and true threats. As for *Keefe*, 402 US at 418-420, it focused on the general rule prohibiting prior restraints, and its analysis might have differed if there was a competing private right at stake, as there is in this case.[3] *Claiborne Hardware*, 458 US at 911-912, likewise omitted any discussion of the exception for speech integral to criminal conduct, presumably because the majority of the respondents in that case were employing lawful measures to bring about political, social, and economic change, rather than unlawful activities like "riot or revolution." Indeed, the Court's disposition in *Claiborne Hardware* required the state to modify its injunction "to restrain only unlawful conduct and the persons responsible for conduct of that character." *Id*. at 924 n 67.

More germane to the issue at hand is this Court's discussion of MCL 750.411s and the related constitutional implications in *Buchanan*, wherein the respondent challenged a PPO prohibiting "posting a message through the use of any medium of communication, including the Internet or a computer," after the respondent spent years posting disparaging comments about the petitioner online. *Buchanan*, 323 Mich App at 172-182. As in this case, the respondent maintained that the First Amendment protected his online postings. *Id*. at 174. After exploring the elements and intent of MCL 750.411s, *id*. at 177-180, the *Buchanan* Court observed:

> Relevant to this case, several courts have also relied on the speech-integral-to-criminal-conduct exception in rejecting First Amendment challenges to stalking statutes, including cyberstalking statutes. …[4] "The government has a strong and legitimate interest in preventing the harassment of individuals." *Thorne v Bailey*,

---

[3] The Supreme Court observed that an injunction against leaflet distribution operated "not to redress alleged private wrongs, but to suppress, on the basis of previous publications, distribution of literature 'of any kind' in a city of 18,000." *Keefe*, 402 US at 418-419. It also found precedent involving privacy rights distinguishable, noting that "respondent is not attempting to stop the flow of information into his own household, but to the public." *Id*. at 420.

[4] *Buchanan* cited the following examples of cases applying the speech-integral-to-criminal-conduct exception to stalking and cyberstalking statutes: See, e.g., *United States v Sayer*, 748 F3d 425, 433-434 (CA 1, 2014); *United States v Petrovic*, 701 F3d 849, 855 (CA 8, 2012); *United States v Osinger*, 753 F3d 939, 947-948 (CA 9, 2014); *United States v Matusiewicz*, 84 F Supp 3d 363, 372-373 (D Del, 2015); *Commonwealth v Johnson*, 470 Mass 300, 310; 21 NE3d 937 (2014); *United States v Sergentakis*, opinion of the United States District Court for the Southern District of New York, issued June 15, 2015 (Case No. 15-cr-33 (NSR)), p 7. As additional authority, *Buchanan* also cited *People v White*, 212 Mich App 298, 311; 536 NW2d 876 (1995), which rejected a free-speech challenge to MCL 750.411h and MCL 750.411i because stalking involved a course of conduct consisting of speech combined with conduct. *Buchanan*, 323 Mich App at 185.

.

846 F2d 241, 243 (CA 4, 1988). See also *United States v Lampley*, 573 F2d 783, 787 (CA 3, 1978) ("Congress had a compelling interest in the protection of innocent individuals from fear, abuse or annoyance at the hands of persons who employ the telephone, not to communicate, but for other unjustifiable motives."). And when the government enacts laws to prevent these types of harassment, any expressive aspects of speech are not protected under the First Amendment when the speech, as an integral part of criminal conduct, serves solely to implement the stalker's criminal purpose in intentionally harassing the victim.

> Similarly, in our judgment, posting a message in violation of MCL 750.411s would not constitute protected speech because the message is integral to the harassment of the victim insofar as it leads to, and is intended to cause, unconsented contacts that terrorize, frighten, intimidate, threaten, harass, or molest the victim. Analogously to the picketers in *Giboney* [*v Empire Storage & Ice Co*, 336 US 490; 69 S Ct 684; 93 L Ed 834 (1949)], an individual posting a message in violation of MCL 750.411s acts with the unlawful objective to induce a criminal course of conduct by prompting others to engage in unconsented contacts with the victim that amount to harassment. While there may generally be a right to express one's views online, no one has the right to intentionally lead others to engage in unconsented contacts that amount to harassment. See *State v Carpenter*, 171 P3d 41, 58 (Alas, 2007) (finding that under the First Amendment, a radio personality could ridicule local critics on-air but that he could not call on listeners to engage in harassment). Generally speaking, because posting a message in violation of MCL 750.411s constitutes speech integral to criminal conduct, the message is not protected. [*Buchanan*, 323 Mich App at 185-186 (some citations omitted).]

This Court did not, however, end its analysis with the conclusion that online posts violating MCL 750.411s amount to speech integral to criminal conduct. Rather, recognizing that courts should be cautious in applying this exception too broadly, this Court considered the circumstances in which speech integral to violating MCL 750.411s should nevertheless be afforded constitutional protection. *Id*. at 186-187. This Court again looked to guidance from other jurisdictions and, finding defamation jurisprudence analogous, held that the test is "whether the postings are intended solely to cause conduct that will harass a private victim in connection with a private matter or whether the publication of the information relates to a public figure and an important public concern." *Id*. at 188-189. "While the government has an interest in preventing the harassment of private individuals in relation to private matters, MCL 750.411s may not be employed to prevent speech relating to public figures on matters of public concern." *Id*. at 191.

In urging this Court to vacate the contempt conviction arising from his Facebook posts, respondent maintains that all his speech on his Through My Eyes group involves "classic issue advocacy," as he attempts to persuade the public to seek improvements in the law and court system relative to child custody matters, protection from sex offenders, and similar issues. The trial court disagreed, opining that respondent's obvious intention was to harass respondent by proxy, and that the posts at issue did not involve a public figure or public matter. We agree with the trial court on these points.

Generally, a public figure is one "who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures . . . ." *Buchanan*, 323 Mich App at 189, quoting *Gertz v Robert Welch, Inc*, 418 US 323, 342; 94 S Ct 2997; 41 L Ed 2d 789 (1974) (quotation marks omitted). A person may be designated as a public figure for limited purposes by voluntarily inserting himself or herself into a particular public controversy. *Buchanan*, 323 Mich App at 189. There is no indication that petitioner has attempted to interject herself into the public realm with respect to the reform sought by respondent. Rather, to the extent she garners any public attention, it is a result of respondent's protracted efforts to bring the parties' legal battles into the lime light.

Moreover, the trial court correctly determined that the problematic aspect of respondent's posts—intentional publication of petitioner's phone number to an audience that could be expected to use the information to harass petitioner—did not involve a matter of public concern. There is no bright-line test for determining what constitutes a matter of public concern, but speech will generally fall in that category if it relates to "any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id*. at 190, quoting *Snyder v Phelps*, 562 US 443, 453; 131 S Ct 1207; 179 L Ed 2d 172 (2011) (quotation marks omitted). Respondent's stated purpose of advancing legal reform undoubtedly meets this general standard, but it does not follow that the same holds true for the specific posts at issue here. The form and context of the speech is also relevant, *Buchanan*, 323 Mich App at 190, and the context is particularly telling in this case.

The parties have a long and bitter history surrounding custody of their daughter, which has prompted petitioner to obtain three PPOs against respondent. Respondent posted the most recent PPO, drawing particular attention to petitioner's phone number, on a Facebook page followed by people known to be hostile toward petitioner and supportive of respondent. The PPO plainly barred respondent from contacting petitioner directly. The only logical reason to comment that petitioner "[s]hould have left the cell numbers off of the petition" was to encourage his audience to contact her in his stead. Several people did just that; petitioner received a number of hateful and ominous text messages, one of which threatened violence against petitioner.

Respondent's argument that this post was a matter of public concern is severely undercut by the obvious fact that petitioner has no ability to change the law regarding child custody and protection. To the extent respondent hoped the contacts resulting from his posts would sway petitioner's stance in the parties' longstanding custody battle, we will not construe the particulars of the parties' dispute as a legitimate matter of public concern. Thus, the only purpose that could be served by a post implicitly encouraging the public to contact petitioner is the improper one identified by the trial court—i.e., the continued harassment of petitioner, in violation of MCL 750.411s and her right to be left alone. See *ARM*, ___ Mich App at ___; slip op at 8 (discussing balancing of free speech against individual rights). Considering the totality of the circumstances, respondent's posts did not involve a matter of public concern, but rather, "a thinly veiled attempt to immunize a private harassment campaign as a matter of public concern." *Buchanan*, 323 Mich App at 190-191.

Because the post was integral to respondent's violation of MCL 750.411s and did not involve speech relating to a public figure on a matter of public concern, the trial court did not abuse its discretion by finding respondent guilty of criminal contempt. Noble as respondent's general

issue advocacy may be, the trial court was not precluded from enforcing its PPO merely because the manner in which respondent purportedly violated its provisions involved speech. See *Buchanan*, 323 Mich App at 185 ("[A]ny expressive aspects of speech are not protected under the First Amendment when the speech, as an integral part of criminal conduct, serves solely to implement the stalker's criminal purpose in intentionally harassing the victim.").

## III. GOOD-TIME CREDIT

Respondent next argues that the trial court erred by ordering that he was not entitled to good-time credit under MCL 51.282(2). We agree.

This Court reviews questions of statutory interpretation de novo. *People v Wiley*, 324 Mich App 130, 150; 919 NW2d 802 (2018). The goal of statutory interpretation is to give effect to the Legislature's intent, as discerned from the words of the statute at issue. *People v Smith*, 336 Mich App 297, 304; 970 NW2d 450 (2021). "If the statutory language is unambiguous, no further judicial construction is required or permitted because we presume the Legislature intended the meaning it plainly expressed." *Id*. at 305 (quotation marks and citation omitted).

Respondent raised this same issue in his previous appeals. This Court previously found the issue moot because each sentence then before the Court had already been completed, but still opted to consider respondent's argument on the merits because it had public significance and was likely to recur, yet evade appellate review. *ARM*, ___ Mich App at ___; slip op at 8-9. In concluding that the trial court erred by ordering that respondent was categorically barred from earning good-time credit otherwise available under MCL 51.282, this Court explained:

> [T]he foregoing language [of MCL 51.282] is not ambiguous. *People v Cannon*, 206 Mich App 653, 655; 522 NW2d 716 (1994). "In clear and unmistakable terms, the Legislature has stated that every county prisoner *shall* be entitled to a reduction of sentence of one day for every six days served where there are no violations of the rules and regulations." *Id*. at 656. While a sheriff has discretion to set a rule on how much good-time credit is forfeited for an infraction of the jail's "rules and regulations," MCL 51.282(2), there is nothing in the statute to suggest that the sheriff has similar discretion to set a rule on whether a prisoner is eligible to earn such credit in the first instance. Likewise, a sentencing court is not permitted to circumvent or nullify the statutory scheme by "taking away good-time credits in advance." *Cannon*, 206 Mich App at 655. Stated differently, "a court may not deprive a prisoner of good-time credit to which the prisoner may be entitled under statute before that prisoner has even begun serving the term of imprisonment." *Id*. [*Id*. at ___; slip op at 9.]

Despite the unambiguous language of MCL 51.282(2) and this Court's interpretation in the previous appeal, the trial court's sentencing orders both stated that respondent was not entitled to good-time credit. Although *ARM* was decided after the last sentencing order at issue in these consolidated appeals, its reasoning is equally applicable, and we are bound to conclude that the trial court again erred by ordering that respondent was not entitled to earn good-time credit under MCL 51.282(2).

## IV. DE FACTO CONSECUTIVE SENTENCING

Next, respondent argues that the trial court engaged in unlawful de facto consecutive sentencing by strategically delaying resolution of the various PPO violation allegations. We again disagree.

This Court reviews questions of statutory interpretation, including authority to impose consecutive sentences, de novo. *Wiley*, 324 Mich App at 150; *People v Parker*, 319 Mich App 410, 414; 901 NW2d 632 (2017). The interpretation and application of court rules is likewise reviewed de novo. *People v Lee*, 489 Mich 289, 295; 803 NW2d 165 (2011).

"The courts will generally refrain from deciding issues that are moot, meaning it is impossible for the court to craft an order with any practical effect on the issue." *Moore v Genesee Co*, 337 Mich App 723, 726-727; 976 NW2d 921 (2021). Respondent's October 15, 2021 sentence in Docket No. 362062 expired on January 16, 2022. Inasmuch as respondent has completed the sentence at issue in Docket No. 362062, this Court can no longer grant relief relative to that sentence. However, respondent apparently still has time remaining on his 93-day sentence imposed on January 4, 2022, because he was released on a personal recognizance appellate bond on February 24, 2022 in his last appeal in Docket No. 358858. Therefore, this claim of error is not moot as it relates to Docket No. 361898.

"The term consecutive or cumulative sentences mean[s] those following in a train, succeeding one another in a regular order, with an uninterrupted course or succession, and having no interval or break. By contrast, the term concurrent sentences refers to sentences operating simultaneously." *Threet v Dep't of Corrections (On Reconsideration)*, 340 Mich App 520, 528; 986 NW2d 653 (2022) (quotation marks and citation omitted). Concurrent sentences are the preferred standard in Michigan, *People v Norfleet*, 317 Mich App 649, 665; 897 NW2d 195 (2016), and consecutive sentences are only permitted when specifically authorized by statute, *Parker*, 319 Mich App at 415. The statute governing sentences for criminal contempt on the basis of a domestic PPO violation provides that a contemnor who is 17 years or older "must be imprisoned for not more than 93 days and may be fined not more than $500.00." MCL 600.2950(23). There is no express statutory language permitting imposition of consecutive sentences for multiple PPO violations. Notably, however, the trial court did not impose consecutive sentences; each of the orders appealed in these consolidated cases provides that the sentence imposed by the order is to run concurrent with the balance of the previous sentence respondent was already serving.

Respondent argues that, despite the concurrent language contained in the sentencing orders, the trial court imposed de facto consecutive sentences by strategically timing the adjudication and sentencing of his various PPO violations so that a new sentence would begin as the previous sentence neared completion. We disagree.

Respondent was arraigned on the bench warrants relevant to these appeals on March 10, 2021. Concerning the August 2020 show-cause motion, the trial court did not hold a hearing until June 4, 2021, approximately 12 weeks after the arraignment; its opinion and order finding respondent violated the PPO was not entered until December 14, 2021, approximately nine months after the arraignment and over six months after the evidentiary hearing; and respondent was not sentenced in that matter for another three weeks, on January 4, 2022. Resolution of the January

2021 show-cause motion suffered from similar, though slightly less substantial, delays: the evidentiary hearing was held on June 25, 2021, approximately 15 weeks after the arraignment; the trial court's opinion and order finding respondent violated the PPO was entered on September 29, 2021, approximately 6½ months after the arraignment and approximately three months after the evidentiary hearing; and respondent was sentenced 16 days later, on October 15, 2021. At the time this sentence was imposed, respondent had 15 days remaining on a previous 93-day sentence imposed July 29, 2021. Respondent's January 4, 2022 sentencing took place when he had 12 days remaining on the 93-day sentence imposed October 15, 2021.

This timeline standing alone might support respondent's argument that the trial court was strategically delaying the proceedings to lengthen the time he would be incarcerated and effectively impose de facto consecutive sentences. But the timeline fails to account for the full scope of the proceedings pending before the trial court in this case.

In March 2021, just before his arrest, respondent filed a motion to disqualify the trial court judge. In April 2021, the trial judge's wife moved to quash a subpoena respondent sent her in connection with his disqualification motion, and respondent filed a second motion for disqualification. The judge recused himself from considering his wife's motion, and respondent moved to terminate the 2020 PPO (his second motion to terminate in this matter). In May 2021, another judge granted the motion to quash the subpoena; the trial court denied respondent's first and second motions to disqualify, as well as similar motions respondent filed in four other cases; respondent filed a third motion for disqualification; and the trial court heard oral argument regarding respondent's motion to terminate the PPO. In June 2021, the trial court held evidentiary hearings on both the August 2020 and January 2021 show-cause motions, and the parties submitted written closing arguments regarding the August 2020 motion. The trial court also entered opinions and orders denying respondent's motion to terminate the PPO and his third motion for disqualification. In July 2021, respondent filed a fourth motion to disqualify; respondent pleaded guilty to a third violation of the 2020 PPO and was sentenced regarding the same; and respondent moved for immediate release on the basis of unaccounted credit for time served since his arrest. In August 2021, respondent moved for emergency de novo review of his motion for immediate release and was advised by the chief judge that there was no authority for de novo review of the trial court's decision to dispense with oral argument. In September 2021 the trial court entered opinions and orders denying respondent's fourth disqualification motion, denying respondent's motion for immediate release, and finding that respondent violated the PPO as alleged in petitioner's January 2021 motion. In October 2021, respondent moved to correct allegedly invalid sentences imposed for past PPO violations and to dismiss the remaining allegations. He also filed his fifth motion for disqualification, along with a supplemental motion alleging that the trial court was deliberately delaying final resolution of the various PPO violations. On October 15, 2021, the trial court sentenced respondent pursuant to his September contempt conviction and his motion to correct his sentences was also heard the following week. In November 2021 respondent moved for bond pending resolution of his previous appeals. In December 2021 respondent moved to dismiss the August 2020 show-cause motion and order, and the trial court entered several opinions and orders—the first found that respondent violated the PPO as alleged in the August 2020 show-cause motion, the second denied respondent's fifth motion to disqualify, the third denied respondent's motion to correct invalid sentences and dismiss, and the fourth denied respondent's

motion for bond pending appeal. A sixth motion to disqualify was also filed in December. Respondent was sentenced regarding the August 2020 PPO violation in January 2022.

The foregoing timeline reveals the occasional unexplained gap in these proceedings, particularly in November 2021. But on the whole, respondent's contention that the trial court was strategically delaying his proceedings to lengthen the time he was incarcerated is unpersuasive. It appears that the trial court scheduled each of respondent's matters as soon as was practical. The trial court gave each issue thorough attention in the detailed opinions it issued on each motion. While the entire process was undoubtedly lengthy, the protracted proceedings were largely attributable to the sheer number of matters the trial court had to address in this and related cases.

Moreover, the motions that resulted in the sentences appealed by respondent were filed in August 2020 and January 2021. Even if the adjudication and sentencing had occurred promptly after each motion was filed, it is probable that the sentences would not have overlapped and respondent would have served just as much time in jail. The record simply does not provide a basis to believe that the trial court was employing strategic docket management to prolong respondent's period of incarceration by imposing de facto consecutive sentences.

Respondent also perfunctorily argues that the trial court's sentencing schedule violated his rights to due process and equal protection. Respondent asserts that "[c]ircumventing the norm of concurrent sentencing absent [a] specific grant of statutory authority for consecutive sentencing by means of scheduling and delay violates Due Process and Equal Protection." However, as we have stated, the trial court did not employ de facto consecutive sentencing in this case. The record shows that delays between adjudications were most likely attributed to adjudicating respondent's many motions. Therefore, it cannot be said that the trial court employed consecutive sentencing in violation of Due Process and Equal Protection.

Next, relying on this Court's opinion in *In re Contempt of Tanksley*, 243 Mich App 123; 621 NW2d 229 (2000), respondent asserts that the trial court's scheduling in these matters violated his right to a speedy trial. Respondent's position is faulty because *Tanksley* did not address the constitutional right to a speedy trial. Rather, it considered the timing requirements set forth in MCL 764.15b and MCR 3.708 for contempt proceedings arising from PPO violations. *Id*. at 127-129. The *Tanksley* Court explained that the versions of MCL 764.15b and MCR 3.708 applicable at the time of the respondent's offense both required the hearing regarding the alleged violation to take place within 72 hours of arrest. *Id*. at 127-128. Drawing guidance from criminal caselaw regarding the timing of a preliminary examination, the Court concluded that the appropriate remedy for failure to hold the contempt hearing within the 72-hour window was dismissal of the charge without prejudice. *Id*. at 130-131.

Construing respondent's argument in these appeals as asserting claims of untimeliness under MCL 764.15b and MCR 3.708, *Tanksley* does not support respondent's claim of error. First, in pertinent part, MCR 3.708(F) provides:

> Following the respondent's appearance or arraignment, the court shall do the following:

-11-

(1) Set a date for the hearing at the earliest practicable time except as required under MCL 764.15b.

(a) The hearing of a respondent being held in custody for an alleged violation of a personal protection order must be held within 72 hours after the arrest, unless extended by the court on the motion of the arrested individual or the prosecuting attorney. The court must set a reasonable bond pending the hearing unless the court determines that release will not reasonably ensure the safety of the individuals named in the personal protection order. [MCR 3.708(F)(1)(a).]

With respect to an individual arrested under MCL 764.15b, subsection (2)(a) similarly requires that the hearing on the alleged PPO violation "must be held within 72 hours after arrest, unless extended by the court on the motion of the arrested individual or the prosecuting attorney." MCL 764.15b(2)(a). Notably, however, the 72-hour requirement applies to "[a]n individual arrested under this section," i.e., MCL 764.15b. MCL 764.15b(2). MCL 764.15b(1) authorizes a peace officer to make a *warrantless* arrest of an individual the officer has reasonable cause to believe violated a PPO if certain conditions are met. Unlike the respondent in *Tanksley*, 243 Mich App at 125, respondent was arrested pursuant to several bench warrants. As such, MCL 764.15b(2)(a) does not apply to respondent.

Instead, respondent's proceedings were controlled by subsection (4) of the statute, which does not contain a timing requirement for the contempt hearing. Moreover, even if the 72-hour period in MCL 764.15b(2)(a) applied in this case, the statute has been amended since the proceedings at issue in *Tanksley*,[5] and the current version now provides that "[a] court shall not . . . dismiss a contempt proceeding based on a personal protection order, or impose any other sanction for a failure to comply with a time limit prescribed in this section." MCL 764.15b(8).

Although the statutory mandate for a hearing within 72 hours of arrest does not apply here, we acknowledge that the court rules contain a similar requirement that "[t]he hearing of a respondent being held in custody for an alleged violation of a personal protection order must be held within 72 hours after the arrest, unless extended by the court on the motion of the arrested individual or the prosecuting attorney." MCR 3.708(F)(1)(a). However, MCR 3.708(F)(1)(a) does not apply to this case because respondent was not held in custody solely because of the alleged PPO violations. Rather, the day after his arrest, another judge arraigned respondent on a bench warrant issued in St. Clair Circuit Court Case No. 18-1969-PH. That bench warrant arose after respondent was sentenced to 60 days in jail for violating a PPO held by a nonparty to the instant case and failed to report to the jail later that afternoon. The judge presiding over the March 4, 2021 arraignment ordered that the previously ordered sentence in that case go into effect immediately. Thereafter, respondent remained incarcerated on additional sentences for PPO violations imposed on March 30, 2021, June 22, 2021, July 29, 2021, and the sentences at issue in

---

[5] The PPO violation at issue in *Tanksley* occurred on March 20, 1998. *Tanksley*, 243 Mich App at 125. MCL 764.15b was amended to include the nondismissal language in 1999, with an effective date of July 1, 2000. 1999 PA 269, enacting § 1.

this case.[6]  At no point after March 4, 2021, was respondent incarcerated merely to await adjudication of the PPO violation allegations at issue in these appeals.  Neither *Tanksley*, MCL 764.15b, nor MCR 3.708 compel the conclusion that the delays in adjudicating and sentencing respondent in these matters require appellate relief.

Lastly, respondent notes that the trial court failed to comply with MCR 8.107(A), which in pertinent part states, "Decisions, when possible, should be made from the bench or within a few days of submission; otherwise a decision should be rendered no later than 35 days after submission."  Subrule (B) requires trial judges to file certified statements identifying "all matters pending during the reporting period that were not decided within 56 days from submission," including the reason that a decision was not made within that time frame.  MCR 8.107(B).  The statements are then submitted to the state court administrator, *id*., thereby facilitating administrative monitoring of a judge's case management.  Viewing MCR 8.107 in its entirety and considering its context within Chapter 8 of the court rules (governing administrative rules), it appears that the timeframe identified in subrule (A) was intended to offer guidance to trial courts regarding timely disposition of pending matters, rather than a black letter rule.  Indeed, by requiring judges to file a statement regarding matters that remain undecided after 56 days, subrule (B) clearly contemplates that a decision will not always be made within 35 days of submission.  If failure to decide a matter within 35 days of submission required dismissal as respondent seems to suggest, there would be no matters that remained undecided after 56 days, and subrule (B) would be superfluous.  This Court will not construe a court rule in a manner that leaves any part surplusage or nugatory.  *People v Byars*, ___ Mich App ___, ___; ___ NW2d ___ (2023) (Docket No. 357013); slip op at 6.  MCR 8.107(A) does not provide an independent basis for relief, nor does it support respondent's contention that the trial court engaged in unlawful de facto consecutive sentencing.

## V.  JAIL CREDIT

In his final claim of error, respondent argues that he is entitled to jail credit for time served under MCL 769.11b.  We disagree.

"Whether a defendant is entitled to credit for time served in jail before sentencing is a question of law that we review de novo."  *People v Armisted*, 295 Mich App 32, 49; 811 NW2d 47 (2011).

MCL 769.11b states,

> Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against the sentence for such time served in jail prior to sentencing.

---

[6] The sentences imposed on March 30, 2021, and June 22, 2021, concerned petitioner's 2016 PPO against respondent, entered in St. Clair Circuit Court Case No. 16-000741-PP.

Respondent contends that he is entitled to jail credit under MCL 769.11b even though the reason he was unable to furnish bond was that he was incarcerated on other sentences. In advancing this position, respondent relies solely on Justice MARKMAN's dissent in *People v Idziak*, 484 Mich 549, 602-633; 773 NW2d 616 (2009) (MARKMAN, J., dissenting), wherein he observed:

> The statute is silent with respect to the reason that a defendant is being held, and only requires that he spend time in jail '*because of* being denied or unable to post bond *for* the offense of which is convicted,' which means that a defendant is entitled to jail credit on his new sentence as long as he cannot post bond for the new offense, regardless of the reason.

Respondent's reliance on Justice MARKMAN's dissent is clearly misplaced, as it lacks the weight of binding precedent. See *Shawl v Spence Bros, Inc*, 280 Mich App 213, 225; 760 NW2d 674 (2008) (explaining that binding precedent requires agreement by a majority of justices). More important, the precedential value of *Idziak* comes from the majority opinion reaching the contrary conclusion. *Idziak* involved a defendant convicted and sentenced to a new term of imprisonment while on parole and, according to the majority, he was not entitled to jail credit because "once arrested in connection with the new felony, the parolee continues to serve out any unexpired portion of his earlier sentences unless and until discharged by the Parole Board." *Idziak*, 484 Mich at 562 (opinion of the Court). Under such circumstances, the defendant parolee "remains incarcerated regardless of whether he would otherwise be eligible for bond before conviction on the new offense." *Id*. In other words, the jail credit statute is inapplicable when the defendant "is incarcerated not 'because of being denied or unable to furnish bond' for the new offense, but for an independent reason." *Id*. at 562-563. The same conclusion has been reached in cases not involving continuation of previous sentences following a parole violation. See, e.g., *People v Raisbeck*, 312 Mich App 759, 765-767; 882 NW2d 161 (2015) (holding that the defendant was not entitled to jail credit for racketeering conviction because she was incarcerated on false pretenses convictions during period before racketeering sentencing); *People v Waclawski*, 286 Mich App 634, 688; 780 NW2d 321 (2009) ("While defendant characterizes his time spent in the Illinois jail as time awaiting extradition on the Michigan charges, he ignores the fact that he was actually serving time in Illinois because he was convicted of a felony in Illinois and was serving his term of incarceration for that felony.").

Respondent was arrested March 3, 2021, and immediately begin serving the 60-day sentence previously imposed by the trial court in a separate matter. On March 30, 2021, only a few weeks into the 60-day sentence, respondent was sentenced to 90 days in jail for violating the PPO petitioner obtained in 2016. Before that sentence was completed, respondent was sentenced on June 22, 2021, to 93 days in jail for another violation of the 2016 PPO. On July 29, 2021, again before the last sentence was completed, respondent pleaded guilty to another violation of the instant PPO and was sentenced to 93 days in jail. With approximately two weeks remaining on his July 29, 2021 sentence, respondent was sentenced on October 15, 2021, to another 93-day jail term for the PPO violation at issue in petitioner's January 2021 show-cause motion. Respondent remained incarcerated on his October 15, 2021 sentence at the time of the last 93-day sentence entered on January 4, 2022. Since his arrest, respondent has continuously been in jail serving sentences for other offenses, regardless of his bond eligibility or ability to post bond. Because he was incarcerated for reasons independent of the bond issue, MCL 769.11b is inapplicable, and the

trial court did not err by refusing to grant respondent credit for time served. *Idziak*, 484 Mich at 562-563.

## VI. CONCLUSION

We remand for correction of the October 15, 2021 and January 4, 2022 sentencing orders to omit the provisions precluding good-time credit. In all other respects, we affirm. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Christopher M. Murray
/s/ Allie Greenleaf Maldonado